[Civ. No. 1633.   Third Appellate District.—March 12, 1917.]

## ANNIE L. LIPPERT et al., Respondents, v. PACIFIC SUGAR CORPORATION (a Corporation), Appellant.

Negligence—Doctrine of Res Ipsa Loquitur.—Where a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.

Id.—Death of Engineer of Sugar-beet Plant—Explosion of Pre-heater — Applicability of Doctrine.—The doctrine of *res ipsa loquitur* is applicable to an action for damages for the death of a master mechanic having the oversight of the machinery of a beet-sugar plant, from the explosion of a "pre-heater" operated by a boy of the age of sixteen years, where it is shown that it was not the duty of the deceased to personally operate the boiler, and he was informed that the heater would safely carry a steam pressure of seventy pounds, when, in fact, it was only built for a maximum pressure of forty pounds.

Id.—Pleading—Specific Acts of Negligence—Right to Rely upon Doctrine—Lack of Waiver.—In such an action the plaintiffs are not precluded from relying upon the doctrine of *res ipsa loquitur* because they charged specific omissions of duties or acts of negligence.

Id.—Risks of Explosion not Assumed.—A master mechanic intrusted with the oversight of all the machinery of a sugar plant does not assume the risk of the explosion of a pre-heater used in connection with the plant, where there is no evidence that the same was out of repair, or that there is any imperfection in it calling for repair, or that it is not in thorough running condition, and the same was operated by an employee under the directions of the superintendent of the plant, and not of the deceased, and upon the representation that it would withstand a steam pressure of nearly double its actual maximum resisting capacity.

APPEAL from a judgment of the Superior Court of Kings County, and from an order denying a new trial.   John G. Covert, Judge.

The facts are stated in the opinion of the court.

Gray, Barker & Bowen, H. Scott Jacobs, and W. C. Petchner, for Appellant.

Lent & Humphrey, and H. P. Brown, for Respondents.

CHIPMAN, P. J.—This is an action for damages brought by the surviving wife and minor child of William Leo Lippert, who, on the fifteenth day of July, 1909, was killed by the bursting of a "pre-heater," used by defendant for the purpose of heating sugar-beet juices.  At the time of the accident Lippert was twenty-eight and one-half years of age and the minor was eighteen months old.  The jury found for plaintiffs in the sum of twenty thousand dollars and judgment was entered in their favor for that amount.  The appeal is by defendant from the judgment and from an order denying its motion for a new trial.

Appellant makes the following points: 1. That deceased was employed as master mechanic and was intrusted with the oversight of all the machinery of the sugar-house; 2. He therefore assumed the risks of his employment; 3. Contributory negligence on the part of deceased; 4. "He fully knew and appreciated and apprehended all of the dangers surrounding his employment"; 5. That if the pre-heater was out of repair it was patent to deceased and it was his duty to have remedied its condition; 6. If that was the condition of the apparatus, he should have complained of it to defendant; 7. When deceased was employed as mechanic and assistant superintendent he expressly assumed the duty of putting all machinery into thorough running condition.

Respondents, in their brief, say: "The long and able opening brief of appellant . . . deals with adjudicated cases and legal principles applicable to litigation involving such propositions as 'Equal means of knowledge,' 'Comparative knowledge of masters and servants,' 'Continuance of employment,' 'Duties of servants to inform masters of defects and danger,' 'Precaution against a known or apparent danger,' or 'Duty of employer to repair.'  The evidence in this case does not require consideration of any of those questions."

Respondents assign, as defendant's negligence: (a) Defendant's informing decedent that the pre-heater would safely carry a steam pressure of seventy pounds when, in fact, it was only built for a maximum pressure of forty pounds; (b) Defendant's failure to use ordinary care in the selection of the culpable employee, John Wegman.

In December, 1908, deceased, who was then employed in a sugar factory at Chino, San Bernardino County, wrote to

Mr. R. L.-McCrea, assistant secretary of defendant corporation, the following letter:

"Mr. R. L. McCrea.

"Dear Sir: Recently learned that your company intends to start your plant at Corcoran. If the same is correct and you have not already selected a man to operate same, would like you to consider an application from me. If your company cares to consider with me the matter, kindly notify me as soon as possible. Will be in city in the latter part of the week; so would call at your office if you desired.

"Yours truly,

"Wm. L. Lippert."

(Written in blue pencil.) "R/R Mr. Cole. Mr. P. has written Mr. Lockwood—& so good team."

A meeting was thereupon arranged, which took place in the defendant's office in Los Angeles, on the twenty-sixth day of March, 1909. As to what then occurred, Mr. W. C. Petchner, the secretary of defendant, testified: "At that meeting, at which Mr. Lippert, myself and Mr. Cole (vice-president and general manager of defendant) were present, I referred to Mr. Lippert's application and told him we wanted somebody to take mechanical charge of the house; that Mr. Connolly (defendant's superintendent) had told us he would not care to undertake the mechanical charge of the house, and Mr. Connolly had stated Mr. Lippert was the one whom we should get, because he had been employed at the house in its construction, and in the installation of the machinery, and was supposed to understand all about it, and he would prefer to have such a man. I told this to Mr. Lippert and asked him what he knew about the house, and also asked him about his previous employment; I told him what duties we should expect from him; that he was to be there as the engineer to take charge of the mechanical part of the house, because Mr. Connolly was a superintendent merely, and not a machinist or engineer. I repeated all this explanation to Mr. Lippert, and asked him if he felt competent to take charge of the machinery of the house. He said he did; that that was his business; that he had been employed in the house the year previously and that he had made out the plan of the house wiring and the placing of the machinery, and had taken part in the installing of the machinery in the house. . . . I took up my active duties at Corcoran in the month of January, 1909, and was

there during all the time the factory was prepared for opera-
tion for that season, although I was away occasionally in San
Francisco and Los Angeles. Mr. Connolly reported to me as
his immediate superior while I was there, and up to the 15th
of July, 1909. Mr. Lippert never made any report to me
during that period or any time prior to the accident regard-
ing any defects in the pre-heater.'' Mr. Cole substantially
corroborated Mr. Petchner's testimony as to the conversation
above set forth. On March 23, 1909, Lippert wrote from
Chino to Mr. Connolly, stating that he had some work to finish
at Chino and that he thought he could take the position at
Corcoran about the 1st of April. He did commence work with
defendant some time in April.

Mrs. Annie L. Lippert testified: ''I reside in San Francisco.
I was married to William Leo Lippert in Oakland in 1906.
At that time he was employed by the American Beet Sugar
Co. as master mechanic at Chino, California. He stayed at
Chino several months and came back to San Francisco where
we remained for a year and a half. Then Mr. Lippert went
to work to Corcoran in the year 1908, where he remained about
six months. Then he was sent for to go to work at Chino.
When they employed him in the sugar factory at Corcoran,
they asked him to take the house as master mechanic. He
had previously worked at Corcoran helping to install some
of the machinery.''

There was received in evidence a contract, dated November
14, 1907, between defendant and the American Foundry &
Machinery Company, under which the latter was to furnish
the former with an ''evaporating system,'' and containing
specifications as to the construction thereof. Said contract
provided: ''Pre-heater to be of steel and to stand a working
pressure of 12 pounds; steam chest to stand a working pres-
sure of 40 pounds.''

M. B. Kearney, a witness for plaintiffs, testified that he had
worked as a steam-fitter in sugar factories in different states
and that he was employed as such at the Corcoran plant,
although eight or ten years had elapsed since he had last
worked in a sugar factory; that he commenced work there
about the 1st of April; that he overhauled all the steam-pipe
that needed working on and put in some new pipe. Refer-
ring to the pre-heater, witness said: ''It is a large cylinder
shaped piece of machinery between eight and ten feet in

length, about six feet in diameter, with a number of brass tubes running through lengthways for the purpose of carrying steam.'' Continuing, witness explained at length the construction of the pre-heater, the location of valves for the control of steam pressure, etc., and, as to its function in the making of sugar, said: ''There is an opening about in the center where the juice [of sugar beets] is admitted and drops down over those tubes and is heated by the steam—juice coming from elsewhere is pumped into the cylinder and spreads out over the heated steam-pipe and passes off into the evaporators.'' As to the ''steam head'' or ''steam chest'' which blew out and caused the death of Lippert, witness said: ''I think the steam head is square and has a lid of cast iron, and is set back a little, kind of concave. . . . It is bolted all around with bolts two or three inches apart.'' He testified that, ''about a week before the campaign started,'' he took the pressure valve apart and cleaned it; the pre-heater was steamed up for several days before the day of the explosion.

Washington A. Connolly was called as a witness by plaintiffs and testified: ''I was employed by defendant at Corcoran as superintendent or sugar expert for sugar manufacturing, from the 15th of March, 1909, until about the 21st of December, 1909. My duties were to take charge of manufacturing and producing sugar from beets and take charge of chemical control of the house; that is, I would be superintendent over the chemists attending to the chemical part of the house—I was superintendent over all the employees of the Pacific Sugar Corporation outside of its office affairs. . . . Mr. Lippert was employed right along, I think, from in April or the first of May. He was hired as master mechanic by Mr. Petchner. I was told so by himself. His duties were to take full charge of all the machinery and at the time he was hired, which was not in the manufacturing season, he was to repair and overhaul everything prior to the manufacturing campaign, which was supposed to start then about the first of July. . . . Mr. Lippert was next in authority to me.'' Witness described the apparatus and said: ''I don't know what pressure this pre-heater, or the heads of this pre-heater, were supposed to be able to withstand, or were constructed to withstand. Q. Did you ever instruct Mr. Lippert as to what pressure they were able to withstand? A. There were no instructions given, except Mr. Lippert and I got together. Q. If you will answer

me yes or no, we will get along quicker. You said you did not? A. No. Q. Did anyone instruct Mr. Lippert as to the pressure? A. As to the pressure? Q. As to the pressure that the heads were supposed to carry. A. No, sir; not that I know of. No, sir; I don't know what pressure the heads were supposed to carry.'' (Witness is handed a paper and asked if he knows in whose handwriting the word ''Lippert'' is.) ''A. That is my handwriting. I presume I gave that paper to Mr. Lippert from the looks of it. That is my handwriting. Whether I gave it to Mr. Lippert or my clerk, it don't make a bit of difference, it was intended to go to Mr. Lippert. It was given to Mr. Lippert before the campaign started, I should judge about the first of July; something like that. That specifies pre-heaters. Mr. Lippert and I got those instructions up ourselves. That paper was received from nobody but myself.'' The paper referred to was offered and received in evidence and marked ''Plaintiffs' Exhibit A.'' It is of some length and contains instructions for operating the various parts of the machinery in the factory. We quote: ''From here draw your juice into pre-heater 'level of juice as indicated by gauge-glass.' The pre-heater is supposed to carry the full seventy pounds on steam end and twelve on exhaust or supply end. I would suggest not to carry over six pounds on supply end, then we can regulate our pressure as required.'' The witness continued: ''Before starting up the plant I called Mr. Lippert's attention to that safety valve, about its sticking. I told him the safety valve was apt to stick occasionally. We had not operated the plant except preliminarily the morning of the 15th of July, 1909. I cannot tell if the safety valve stuck that day. . . . A few minutes before the rear end of the pre-heater blew out I was around there talking to Mr. Lippert there manipulating the pre-heater, and as near as I can remember, I think I noticed a pressure of a little over twenty pounds on the steam end, and about eight or ten pounds on the low-pressure side. . . . I knew a boy named Wegman. His duties were to run the pre-heater and the evaporators. I employed him for that purpose. We ran a preliminary test of the pre-heaters about a month previous to that. Mr. Lippert was there at the time. It was tested more for leaks and things of that kind and to ascertain if the lines were all in good order. So far as I know it was not subjected to a water-pressure test. There is

a way to test the pressure as to what a cast-iron head should withstand—the hydrostatic test. That is the only way unless you put the steam pressure on. You are liable to blow up anything in testing with steam. . . . I did not, nor as far as I know did anyone else, tell Mr. Lippert at what to fix the safety valves on the pre-heater. That safety valve [referring to diagram] was to be set by my instructions to Mr. Lippert to carry not over twenty-five pounds. Those instructions were given verbally. Besides that, Mr. Lippert made a special safety valve and put it in farther on the other line. I never ran the pre-heater. It was practically a new apparatus to me. There was no test of the pre-heater made while I was employed by the company. . . . On the day this accident occurred the evaporators had just been started up—Mr. Lippert started them up himself. Mr. Wegman was there and Mr. Lippert was instructing him. This was the first day and the juice had just got started there. I employed Mr. Wegman. I don't think he had had any previous experience in that line. I had not given him any instructions so far. I told him what his duties were when I employed him. We hired him for the evaporator. . . . When the accident occurred I should judge I was about twenty-five feet from the pre-heater. All that I saw was steam. Just at the time when I was coming around the corner I saw Mr. Lippert reach up and get hold of the wheel—there was a wheel that was connected through to the steam valve supplying steam to the pre-heater." On cross-examination witness said: "When I wanted information respecting the working of the machinery or the condition of it in the house I would go to Mr. Lippert. I had no technical knowledge of it at all, but resorted to Mr. Lippert for information concerning the technical points of the machinery. . . . Mr. Lippert told me that he knew all about the pre-heater, as he helped to build it and tested it the previous year. That was about the synopsis of it. He always said that he was afraid of the pre-heater, because he said some day the thing would blow up."

The deposition of John Wegman, taken on behalf of plaintiffs, was read in evidence. He deposed as follows: "I will be eighteen years of age the ninth day of August, 1911. I reside in Visalia and am now working in an automobile shop. I was working in the sugar factory at Visalia and Mr. Sieland, the superintendent, sent me down to Corcoran. There

I was introduced to Mr. Connolly, the superintendent, who sent me to Mr. Williams, the beet end foreman. Mr. Williams showed me the next day the different valves on the evaporators and pre-heater.'' Witness described the machinery and continued: ''This pre-heater had valves on it. There was one valve I know to leave the steam in, that ran down towards the front end of it. Mr. Lippert had his hand on it. It is made of iron and had an iron wheel on the end. The wheel was blown off at the time of the explosion. . . . There was a safety valve on top of the pre-heater. I don't know what its use was. I don't know about the uses of the pipes in the pre-heater nor how it operated. . . . When I went to work at the sugar factory the work I was to do was to run the evaporators and the pre-heater. Mr. Williams he came around and gave me orders and showed me all the valves. Mr. Williams told me how to start them up and told me about the different valves and told me how much steam to carry on the evaporators. He told me to carry five or six pounds on the first evaporator and the next evaporator I don't know just exactly what he told me, nor do I remember now what he told me to carry in the pre-heater. I had never seen nor operated a pre-heater before. We had started up the pre-heater the morning of the day Mr. Lippert was killed. We got the evaporators hot and full of juice and it was just getting started. When the accident occurred and Mr. Lippert was killed he had hold of the valve and I was right off to one side of them. He had hold of the valve that you turn the steam in with into the pre-heater. I stood there for a second, not more than a second and then I started away and just as I started away, the pre-heater blew out. While I was standing there those couple of seconds I noticed the steam gauge on the pre-heater. It registered about twenty-three pounds. I don't know who turned the steam into that pre-heater; Mr. Lippert had hold of the valve at that time; that is all I know. . . . Q. Did you have any conversation at all with Mr. Lippert in regard to that pre-heater? A. No, sir; I never had no conversation with him at all. He just come around and asked me how things were running. At the time I stood those couple seconds and looked at the steam gauge, I noticed the pre-heater steam head was leaking a little bit, a little around the bolts.'' The witness stated that the mechanics had screwed up the bolts; that the bolts did not give way, but

that the sheet of iron that covers the pre-heater blew out. At the time of the explosion he was about a foot and a half away from the pre-heater and received an injury on his wrist. He did not know at what pressure the safety valve was set and did not remember what amount of steam he was supposed to carry in the pre-heater.

M. B. Kearney was recalled and gave further details of what occurred at the time of the accident, and James Mack Hale was also sworn as a witness for plaintiffs and testified to facts similar to those given by other witnesses.

R. S. Bulla, connected with beet-sugar factories since 1890, part of the time as superintendent, testified on behalf of defendant. He described the operation of evaporators and pre-heaters, although he said the pre-heater at the Corcoran plant was the only one he had ever seen. He said: "A boy of sixteen years is perfectly able to watch the system of four evaporators and one pre-heater and to observe the steam and juice level in each one. . . . The master mechanic is master of the mechanical department. It is his duty to regulate the steam pressure on the evaporators. By regulating the evaporators, I mean the setting of the relief valves and giving the evaporator-man in charge those instructions of how far and how high the steam pressure might rise, and in regulating the reducing valves and allowing no more steam in than he considers, in his opinion as an engineer, is safe for the machine."

G. D. Kiefer, a witness for defendant, testified: "I reside at Corcoran, where I have lived for almost five years. My trade is that of a machinist. I went to work for the Corcoran sugar factory on the 4th of March, 1908. . . . Mr. Lippert was master mechanic there, in which capacity I have had conferences with him. . . . At the time of the explosion I was probably fifteen or twenty feet from the pre-heater—within a few minutes before the explosion. I could see the pre-heater from where I was. Just before the explosion Mr. Lippert and I sat on the water line. We talked about the pre-heater. I wanted him at that time to cut it off; I told him that it was a detriment and no use to the factory. He said that the machinery was put there to run, and he was going to run it; we came back in around the pre-heater and steam was coming out through the bolt holes on the south end of it. Mr. Lippert called Mr. Connolly; Mr. Connolly had been talk-

ing to Mr. Wegman whom he had at that time been showing how to run the evaporator. Mr. Connolly came over and spoke to Mr. Lippert a few words and I walked back. . . . Then Mr. Lippert started to working with the wheel of the long valve that leads to the main steam line, as I understand it. I turned around and left the factory, or attempted to. I left because I did not think it was policy to stay around. I was afraid of it. The steam was issuing from the steam chest then. . . . The only thing Mr. Lippert said at that time was that he was afraid to start the pre-heater. I had talked with him before that. He said that he did not believe that the steam lines were connected up properly. He said he thought that the steam lines could be fixed so they would work—that he was going to try to run them to the pre-heater.'' On cross-examination witness said: ''In the position I held at the time, I was not supposed to know anything about the machinery. My trade is a machinist but I was the yard man there, I had control of the yard. If anything happened to the machinery out there I went to Mr. Lippert. Mr. Lippert had entire charge of the machinery part of the factory.''

Upon the close of plaintiffs' case, defendant moved for a nonsuit on the grounds: 1. That no negligence on the part of defendant has been shown; 2. Deceased was guilty of contributory negligence; 3. Deceased assumed the risk of the employment. The court denied the motion for nonsuit.

In Shearman and Redfield on Negligence, section 60, the following rule is declared: ''Where a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.'' In *Rose* v. *Stephens etc. Co.*, 11 Fed. 438, it is said: ''In the present case the boiler which exploded was in the control of the employees of the defendant. As boilers do not usually explode when they are in a safe condition, and are properly managed, the inference that this boiler was not in a safe condition or was not properly managed, was justifiable.'' It was further said that, while the rule is more frequently applied in cases against carriers of passengers than in any other class, there is no foundation for limiting the rule to carriers. ''The presumption,'' said the court, ''origi-

nates from the nature of the act, and not from the nature of the relations between the parties.''

The cases are industriously cited and considered in *Judson* v. *Giant Powder Co.*, 107 Cal. 549, [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020]. Referring to the case of *Young* v. *Bransford*, 12 Lea (Tenn.), 232, which supports a contrary doctrine, attention is called to the following language in the reported opinion of that case: ''At the same time the fact that there was an explosion, which is not an ordinary incident of the use of a steam boiler, ought to have some weight, inasmuch as it may be out of the power of the aggrieved party in some instances to prove any more. The reasonable rule would seem to be that laid down by Judge Wallace: 'That from the mere fact of an explosion it is competent for the jury to infer, as a proposition of fact, that there was some negligence in the management of the boiler, or some defect in its condition.' '' We are satisfied that this is a case where the doctrine of *res ipsa loquitur* is applicable, and plaintiffs are not precluded from relying upon it because they charged specific omissions of duties or acts of negligence. This latter proposition is well supported in *Cassady* v. *Old Colony Street Ry. Co.*, 184 Mass. 156, [63 L. R. A. 285, 68 N. E. 10], where it was said: ''The defendant also contends that even if originally the doctrine would have been applicable, the plaintiff had lost or waived her rights under that doctrine (*res ipsa loquitur*), because, instead of resting her case solely upon it, she undertook to go further, and show particularly the cause of the accident. This position is not tenable. It is true that, where the evidence shows the precise cause of the accident, as in *Winship* v. *New York, N. H. & H. R. Co.*, 170 Mass. 464, [49 N. E. 647], and similar cases, there is, of course, no room for the application of the doctrine of presumption. The real cause being shown, there is no occasion to inquire as to what the presumption would have been as to it if it had not been shown. But if, at the close of the evidence, the cause does not clearly appear, or if there is a dispute as to what it is, then it is open to the plaintiff to argue upon the whole evidence, and the jury are justified in relying upon presumptions, unless they are satisfied that the cause has been shown to be inconsistent with it. An unsuccessful attempt to prove by direct evidence the precise cause does not estop the plaintiff from relying upon the presumptions applicable to it.''

Plaintiffs may therefore rely on the presumption of defendant's negligence although they endeavored, as did defendant, "to show particularly the cause of the accident."

Deceased was shown to have been competent "to be there as the engineer, to take charge of the mechanical part of the house," for which purpose he was employed, as a witness testified. He had a general knowledge of the plant and the machinery there in use, for he helped to install some of it. It was not, however, a part of his duty personally to operate the different machines of the plant or any one of them. Other persons were in personal charge of their operation. The evaporators, including the pre-heater, the explosion of which caused the death of Lippert, were, by Superintendent Connolly, placed in charge of the boy, Wegman, less than sixteen years old. Wegman was told by Connolly to report to Williams, the beet foreman, for instructions how to run the pre-heater, and Wegman testified that no instructions were given him by deceased and that all he had were given by Williams to whom Superintendent Connolly sent him. He testified: "Williams, he came around and gave me orders and showed me all the valves. Mr. Williams told me how to start them up and told me about the different valves and told me how much steam to carry on the evaporators." Wegman could not remember what his instructions were as to the pressure he was to carry in the pre-heater. This was quite an important fact for Wegman to know, and as he had no knowledge except as he got it from Williams, and as Connolly sent him to Williams, it is fair to presume that Williams had the information given in the superintendent's written instruction that "the pre-heater is supposed to carry the full seventy pounds on steam end," and so instructed Wegman. Connolly testified that there were six copies made of these instructions, and they show on their face that they were intended for the information of the foreman of the different departments of the plant. Wegman testified that he "had never seen nor operated a pre-heater before." Witness Bulla testified that "a boy of sixteen years is perfectly able to watch the system of four evaporators and one pre-heater and to observe the steam and juice level to each one." The jury were informed in great detail by witnesses as to the component parts of the plant, and their several offices and illustrative diagrams were used to aid in the explanation. We think,

with the information placed before them, they were as well qualified to form an opinion of Wegman's competency as was the witness Bulla. How far the immaturity in years or the ignorance of Wegman contributed to the explosion of the boiler was a matter for the jury to determine under all the facts and circumstances. He testified that a second or two before the explosion he had been standing near the pre-heater and noticed that the steam gauge registered twenty-three pounds. Connolly testified that a few minutes before the explosion he was around there and "noticed a pressure of a little over twenty pounds on the steam end." Witness Kearney, a steam-fitter, employed by defendant, was sent by Lippert to tighten up some bolts around the steam-head that were leaking. He gave, in his testimony, a very complete description of the pre-heater. He testified that Lippert came to where he was working and told him to take his helper and go to the pre-heater as it was leaking slightly; that he went to the boiler with his helper; that Wegman was there, whose duty was "to see that the steam gauges were kept at a certain stage"; that Williams was there also; that he, the witness, and his helper, tightened up the bolts where the leak mostly was and after tightening up the bolts he "looked up at the steam gauge and saw it registered in the neighborhood of forty-seven pounds"; he "turned to Williams [who was Wegman's instructor], the beet foreman, and said: 'How much steam do you generally carry in that pre-heater?' He looked up at the gauge and said: 'That's right.'" Thereupon Kearney and his helper left, Kearney remarking to his helper: "Pack up your tools and let's get out of here." He testified that they had walked over to the machine-shop where they had been working, a distance of fifty or seventy-five feet, when the explosion occurred. He immediately returned and found Lippert in the pit close to the boiler, where he died in about ten minutes. Lippert was not at the boiler when Kearney was tightening the bolts and when Kearney spoke to Williams, but he seems to have returned to the heater during these few seconds and about all we can learn from the testimony is, as testified by Wegman: "He [Lippert] had hold of the valve that you turn the steam in with into the pre-heater." Williams did not testify at the trial. Wegman's testimony was that the steam gauge read twenty-three pounds, but against this is the testimony of Kearney, a steam-

fitter, who had called Williams' attention to the fact that the gauge showed forty-seven pounds, and seems to have hastened to get away, although Williams replied: "That's right." The machinery had been tested before "starting up," and apparently all the parts were in working order. Lippert did not live to explain what he intended to do when he took hold of the valve that controlled the intake of steam to the heater. Under the circumstances the only reasonable conjecture that can be indulged is that with steam escaping around the bolt-heads and somewhat around the edges of the boiler-head, as the testimony showed was occurring, he would naturally endeavor to shut off the pressure. But it was too late. At that second, according to Wegman's testimony, the explosion occurred. We think the jury were justified from the evidence in finding that Williams and Wegman allowed the steam pressure to reach forty-seven pounds, which was seven pounds more than the maximum "working pressure" which the maker of the pre-heater had stipulated it was to stand. Superintendent Connolly admitted that he gave the written instructions which allowed a pressure of seventy pounds. In his testimony he seems to have sought to make Lippert equally responsible for the instructions. He did not testify, however, that Lippert knew anything about the contract between defendant and the maker of the boiler; nor did he testify that Lippert had anything to do with formulating that part of the instructions relating to the pressure. He at first testified that no instructions were given to Lippert upon this point. When confronted with the written instructions he admitted that they were in his handwriting and were given to Lippert before the campaign started, and added: "Mr. Lippert and I got those instructions up ourselves." Lippert knowing nothing of the specifications made by the boiler-maker and Connolly knowing what they were, it is not at all likely that Lippert fixed or had anything to do in stating the pressure which the pre-heater would withstand. Connolly testified that he called Lippert's attention to the safety valve, that it "was apt to stick occasionally," but he did not know that it stuck that day, and there was no evidence that it was out of order. He testified that "the safety valve [referring to diagram] was to be set by my instructions to Mr. Lippert to carry not over twenty-five pounds. Those instructions were given verbally." He also testified that Lippert in-

structed Wegman. Wegman testified that all the instructions he received were given by Williams to whom Connolly sent him. We do not think the jury were compelled to accept at its face value the testimony of Connolly as to verbal instructions or conversations with Lippert, who being dead could not explain or refute them. Connolly may not intentionally have misstated any fact, but his memory may have been at fault. Evidence of alleged declarations of deceased persons is always more or less unsatisfactory, and the unsupported testimony of a single person as to a conversation between himself and a deceased person is regarded as the weakest of all kinds of evidence. (*Mattingly* v. *Pennie,* 105 Cal. 514, [45 Am. St. Rep. 87, 39 Pac. 200]; *Austin* v. *Wilcoxson,* 149 Cal. 24, [84 Pac. 417].)

Connolly's connection with the accident and the responsibility resting upon him in a greater or less degree for the unfortunate accident justifies classing him as a hostile witness, although circumstances compelled plaintiffs to call him as a witness to establish certain facts.

Recurring to the grounds for a reversal of the judgment, as stated by defendant in its brief, it may be conceded as proven that deceased "was intrusted with the oversight of all the machinery of the sugar-house," but it does not follow that "he assumed all the risks attending his employment." There was no evidence that the pre-heater was out of repair, or that there was any imperfection in it calling for repair or complaint to defendant, or that it was not in thorough running condition. In fact, it was not an indispensable part of the plant, for Connolly testified that defendant dispensed with it altogether after the accident. No reasonable cause for the explosion can be assigned, based upon any evidence, other than it was caused by an excessive pressure of steam to which the pre-heater was subjected by the employee of defendant, whose duty, under the authority of defendant, it was to operate this machine. There was evidence that this employee was performing this duty under the immediate instructions of Williams, and not under the direction of Lippert at the time the explosion occurred. If Williams was governed by or had in mind the written instructions, which we think must be presumed, he may not have been at fault, but surely defendant was in giving them, and the responsibility thus passed to defendant for the accident.

We can see no ground for sustaining defendant's contention that the explosion was caused by Lippert's contributory negligence. He, too, was authorized to assume that the preheater would withstand seventy pounds pressure, nearly double its actual maximum resisting capacity. Considering all the facts and circumstances, the primary cause of the accident seems more reasonably traceable to the erroneous instructions given by the superintendent upon a very vital matter than to any other cause, and for this defendant alone is responsible. But if from all the evidence no reasonable explanation of the accident, acquitting defendant of blame, was shown, the verdict and judgment may rest upon the presumption of defendant's negligence.

In its opening brief the specifications of errors called to our attention are, in substance, that the court erred in not granting defendant's motion for nonsuit on the ground of the insufficiency of the evidence and the refusal of the court to instruct the jury to return a verdict for defendant. Also on the ground that the court permitted plaintiffs to amend their complaint at the conclusion of the evidence for plaintiffs by charging defendant with culpability in the selection of an incapable employee, to wit, John Wegman. There is also a general specification of the insufficiency of the evidence in certain particulars. We do not think the court would have been justified in granting the motion for a nonsuit nor in directing a verdict for defendant. There was sufficient evidence to sustain the verdict and judgment. In allowing plaintiffs to amend their complaint, the court was exercising a discretion confided to it, the abuse of which alone could justify reversal. The ruling of the court did not carry with it an implication that Wegman was in fact incompetent to perform the duties assigned to him. The implication was that there was sufficient support in the evidence on the point to go to the jury for determination.

The judgment and order are affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 10, 1917.