[S. F. No. 16381. In Bank.—November 7, 1940.]

WALTER A. JUCHERT, Respondent, v. CALIFORNIA WATER SERVICE COMPANY (a Corporation), Appellant.

502

J. E. McCurdy and Theodore M. Stuart for Appellant.

Francis M. Foley and Hugh F. Mullin, Jr., for Respondent.

CARTER, J.—Defendant herein appeals from a judgment for plaintiff in an action for personal injuries brought against the California Water Service Company, a corporation, and the city of San Mateo. The injuries complained of allegedly were sustained when the motorcycle upon which plaintiff was riding struck a trough-like depression in the highway known as El Camino Real, north of its intersection with Second avenue in said city of San Mateo.

The first trial of the case before a jury resulted in a verdict in the sum of $10,000 for plaintiff and against both defendants. Their motions for a new trial were granted. A second trial of the action terminated in a mistrial due to the illness of one of the jurors. At the conclusion of the evidence in the third trial, the court directed a verdict in favor of the defendant city of San Mateo and submitted the case to the jury as against the defendant California Water Service Company. The jury returned a verdict against said defendant in the sum of $8,000. A motion for a new trial was denied, whereupon said defendant California Water Service Company appealed from the judgment entered against it.

The major contention of the defendant California Water Service Company, hereinafter referred to as the defendant, is that the verdict of the jury on which judgment was entered in the trial court is not supported by the evidence.

■ As is always true on such appeals, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences must be indulged in to uphold the verdict, if possible. It is elementary that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. And when two or more inferences can reasonably be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury or trial court. (*Crawford* v. *Southern Pac. Co.*, 3 Cal. (2d) 427 [45 Pac. (2d) 183]; *Treadwell* v. *Nickel*, 194 Cal. 243 [228 Pac. 25]; *Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 Pac. 1157]; *Wing* v. *Kishi*, 92 Cal. App. 495 [268 Pac. 483].)

Bearing these rules in mind we turn to the evidence.

El Camino Real, one of the main highways in the State of California, passes through the city of San Mateo in a general northerly and southerly direction. It is crossed by Second Avenue which runs from east to west. At a point about 100 feet north of the intersection of those streets, El Camino Real is crossed at right angles by San Mateo creek. The stream is bridged by a sunken culvert which is covered by a deep fill. On the morning of March 9, 1936, the time of the accident, a hole had sunk in the surface of the highway at a point immediately adjacent to the curb on the east side of the highway and 186 feet north of the intersection of Second avenue with the highway. According to the descriptions of the various witnesses, the hole was from four to eighteen inches deep near the curb on the eastern boundary of the highway, it was from fourteen to thirty-six inches wide and extended southwesterly six to forty feet out into the roadway, gradually diminishing in depth.

The plaintiff was a mail carrier engaged in traversing the streets of San Mateo daily but was not aware of the existence of said hole. In making his rounds on the morning of March 9, he was traveling at a speed of about twenty or twenty-two miles an hour in a northerly direction and did not see the hole in time to avoid hitting it. When his motorcycle hit the hole the plaintiff was thrown and suffered the injuries complained of.

Prior to 1936, El Camino Real, immediately south of the place of the accident, ascended toward the south in a steep grade over a substantial hill. At that time the highway, though paved, was but thirty-five feet wide between curbs. In 1935, the state highway department reduced the grade of El Camino Real at this point and extended the new highway to a width of seventy-six feet between curbs, and a width of one hundred and two feet over all.

The top of the original hill was at or near the intersection of Second avenue with El Camino Real, and in doing the reconstruction work the top of the hill was removed and a very large fill made at the bottom of the hill to the north where El Camino Real crossed San Mateo creek.

To support this heavy fill a retaining wall of concrete was constructed along the east side of El Camino Real. This wall extended from Second avenue to the Mills Memorial Hospital which adjoins the highway on the east. El Camino Real extends along the grounds of the Mills Memorial Hospital, which abut it on the east, a distance of over four hundred feet from Second avenue on the south northward to Baldwin avenue. The hospital itself is substantially in the center of the grounds north and south.

A concrete culvert in the form of an arch was constructed over San Mateo creek. The fill was twenty-two to twenty-seven feet deep in places and was placed over the culvert. The old road was not taken out but the fill was placed on top of it and the sides were filled in to bring the whole to a uniform grade and width.

After the work was completed a width of seventy-two feet was surfaced with asphaltic concrete. Along the side on the east a two foot gutter and a curb were installed. Immediately east of the curb and adjoining the same is a five foot concrete sidewalk. Then immediately east of the sidewalk and between it and the retaining wall which extends along the boundary of the Mills Hospital grounds is a gravel strip approximately seven feet wide. This gravel strip is entirely "new-made-ground", namely, a part of the fill that is entirely outside and to the east of the old paved roadway, and like the rest of the fill is made of loose dirt, red or white rock and other fill material.

When the culvert was being placed in position the public utilities were assigned positions in this strip where they could

install their conduits and pipes. On the east end of the culvert the San Francisco Water Company was assigned a place on a plane four feet below the surface for the laying of its thirty-six inch water pipe. Slightly above and to the east, a space was assigned to the defendant to lay its twelve-inch iron water pipe. At this point these pipes extended in a northerly-southerly direction approximately paralleling the middle line of the highway. A pipe of the Pacific Gas and Electric Company which passed through the wall and entered the hospital grounds was already in place. The concrete retaining wall between the seven-foot gravel strip of the highway and the Mills Hospital grounds was poured over and around it.

On Friday, March 6, 1936, inside the hospital grounds, water was seen percolating through the hole in which this pipe of the Pacific Gas and Electric Company pierced the eastern wall. The amount of water emanating therefrom was described as such quantity as might flow through a one-half inch pipe not under pressure. That water ran across the hospital grounds down into San Mateo creek.

Shortly thereafter the defendant company was notified of this condition and its agent made an examination to ascertain if its water pipe was broken, but he found no leak.

After the accident the San Francisco Water Company started an excavation for the purpose of ascertaining whether there was a possible leak in its line, but before it reached its deeper laid pipe, ascertained that the leak was in the defendant's water main. Thereupon defendant dug down and located a crack in the bottom of one section of its pipe. The cracked section of the main was taken out and a new one installed. The evidence does not disclose definitely whether the water then ceased to flow through the hole in the wall occupied by the pipe of the Pacific Gas and Electric Company, for the same witness at one time said he did not notice if the water stopped flowing outside the wall, then later said, whatever the source of the water it stopped after the pipe was repaired. The hole in the roadway was later filled by the city of San Mateo.

That the road sank and thereby created the hole on the surface is clearly shown. What caused it was the real issue on the trial of this case. There was no direct evidence. The plaintiff contends there was an inference that the road was

caused to sink by water which escaped from the defendant's broken pipe into the filled ground, or by drainage water increased by the water that so escaped from defendant's pipe.

The defendant contends that the road was caused to sink because it was built on filled ground or because the filled ground was saturated with drainage water.

According to plaintiff, defendant was negligent in the following particulars: (1) in laying its water main across the concrete arch of the culvert with only a two foot cushion of fill between the pipe and the arch while immediately adjacent thereto the pipe rested on twenty-five feet of fill, without taking proper precautions to prevent a break in its pipe which might result from the settlement of the fill; (2) in failing to test the pipe for leaks before covering it; and (3) in failing to shut off its water within a reasonable time after being notified of the leak in the main.

Whether from the facts proved it can be inferred that defendant was negligent in all or any one of these respects, and that the depression in the highway which caused plaintiff's injuries occurred as the result of such negligence is the question to be determined.

■ Where there is no evidence or not even slight evidence of an essential fact to be proved by the plaintiff, a conclusion of a trial court or jury based thereon becomes a mere conjecture and does not rise to the dignity of an inference. (*Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363 [64 Pac. 480]; *Reese* v. *Smith*, 9 Cal. (2d) 324, 328 [70 Pac. (2d) 933].) An inference is a deduction which the reason of the jury makes from the facts proved. (Sec. 1958, Code Civ. Proc.)

■ The rule is not, as is sometimes contended and occasionally stated by the courts, that in order for an inference to be established by circumstantial evidence it must be the only inference which can fairly or reasonably be drawn from the circumstances relied on, or that if other inferences may reasonably be drawn from the facts in evidence, the evidence does not support the inference sought to be deduced from it.

As stated in *Robertson* v. *Weingart*, 91 Cal. App. 715, 723 [267 Pac. 741], said principle is more applicable as a rule to guide a jury in its deliberations upon the facts, than it is a rule to guide the appellate court in passing upon the sufficiency of the evidence. (*Peters* v. *McKay*, 136 Cal. 73 [68 Pac. 478].)

The correct rule has been stated in the recent case of *Weiand* v. *Southern P. Co.*, 34 Cal. App. (2d) 500 [93 Pac. (2d) 1023], wherein it was held that there must be substantial proof of negligence in any case to authorize a recovery, and that where a plaintiff has failed to make out a case for the jury on *either* of two theories or establishes *neither* of two inconsistent inferences no recovery can be had. The court said, "If, however, plaintiff has proven sufficient facts to justify a verdict upon *one* theory, the fact that there may be one or more seemingly rational explanations of the episode in no manner precludes a recovery or invalidates the verdict. These are mere matters of argument to be presented to the jury." The court further quoted from the opinion of Judge Rudkin in the case of *Hobbs, Wall & Co.* v. *Petterson*, 2 Fed. (2d) (C. C. A.) 594, to the following effect:

" 'But the court was not compelled to accept any of the theories advanced by the plaintiff in error. The mere suggestion of such theories did not necessarily throw the case into the realm of speculation and compel a finding in its favor. As said by the court in *Wabash Screen Door Co.* v. *Black*, 126 F. 721, 725, 61 C. C. A. 639, 634: "While the evidence was circumstantial, it was ample in our opinion, to warrant the submission of the question to the jury under the instructions given. . . . Doubtless a jury ought not to be permitted to speculate, in the sense of guess, between causes, when no reasonable explanation of the injury can be found in the testimony. . . . But, in the absence of direct testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and disqualify it from determining the cause of the injury complained of. The theories suggested may be forced and fanciful, finding no reasonable foundation in the facts proved. They may be explanations which do not explain; which the common sense of the jury, when applied to the testimony, would instantly reject." ' "

A recent pronouncement of this court in the case of *Hamilton* v. *Pacific Elec. Ry. Co.*, 12 Cal. (2d) 598, 600, 602 [86 Pac. (2d) 829], states the true position of an appellate court in cases where several inferences may be drawn from the evidence presented to a jury or trial court:

"It may be confidently declared that, founded upon the evidence, the jury not only is authorized to make any logical

and reasonable deduction, but also that the jury is the exclusive judge of the weight and value of the inference that may be drawn by it; furthermore, as corollary thereto, that any attempt on the part of an appellate court to draw an inference of fact constitutes 'a usurpation of the province of the trial court'. The fact that some inference other than that which has been drawn by a jury may appear to an appellate tribunal to be the more reasonable, affords no sufficient reason for disturbing the inference in question. (10 Cal. Jur., p. 735 et seq.) It also appears to be well-established law that notwithstanding the fact that the evidence upon which the inference is founded is undisputed or without conflict, an appellate court has not the power to draw an inference different from that which the jury has deduced. (See, also, *Anderson* v. *Los Angeles Transfer Co.*, 170 Cal. 66, 67 [148 Pac. 212]; *Mah See* v. *North Am. Acc. Ins. Co.*, 190 Cal. 421, 426 [213 Pac. 42, 26 A. L. R. 123]; *Crawford* v. *S. P. Co., supra*; *Raggio* v. *Mallory*, 10 Cal. (2d) 723 [76 Pac. 660, 115 A. L. R. 836]; *Bellon* v. *Silver Gate Theatre, Inc.*, 4 Cal. (2d) 1 [47 Pac. (2d) 462]; *Knapp* v. *Bergman*, 5 Cal. (2d) 368 [55 Pac. (2d) 218].)

The evidence presented in this case is voluminous and, in some instances, highly conflicting.

An employee of the defendant was of the opinion that the crack in defendant's water main occurred as the result of the sagging of the pipe due to the natural settlement of the fill. The plaintiff, however, contends that defendant was negligent in laying its water main across the concrete arch of the culvert without sufficient cushion of fill. Although it does not appear anywhere in the record that the defendant's pipe actually touched the concrete, plaintiff urges that a pipe would naturally bend and break where but two feet of fill separated it from the concrete arch and where the pipe, immediately adjacent thereto, was laid over twenty-five feet of fill. It is plaintiff's position that had defendant taken proper precautions to prevent a break or maintained its pipe properly it would not have been cracked by the settlement of the fill. In support of this contention plaintiff points out that the water main of the San Francisco Water Company, laid in close proximity thereto, did not break.

No contention was made that the defendant did not use good quality pipe. That used was new, of cast-iron, and came

in sections twelve feet long and twelve inches in diameter. One end was bell-shaped, the small end was inserted in the bell, and the joint was caulked. Redwood blocks about two feet long and four inches square on the end were laid at the bottom of the trench under the joints of the pipe. Defendant's witnesses testified that the pipe was laid under the supervision of the engineers of the state highway department; that the water was turned on while the pipe was still exposed; and that it was examined for leaks for a period of three weeks before the fill was tamped in around it and the pipe covered. A disinterested witness, however, presented by the plaintiff, testified that the pipe he saw laid close to the bridge was laid two or three sections at a time and covered immediately without allowing time for settlement of the fill or testing for leaks. Plaintiff points out that the testimony of the highway inspector was that he saw part, but not all of the pipe exposed to permit testing for leaks.

Defendant claims that it was not negligent in failing to shut off the water in its main on March 6, because there was no leak in its pipe on that date. The employee who reported no leak testified that he made his examination in a manner customarily used by water companies. This examination consisted of attempting to thrust a pointed three-eighths inch iron rod into the gravel strip above defendant's water pipe and near the Pacific Gas and Electric Company's pipe hole in the hospital grounds, and of attaching a mechanism known as a leak detector to the pipe to listen for the "sizzling" sounds which should indicate a break. The employee stated that he found no softness of the soil and no sound indicating a leak, but that on March 9, the date of the accident, the same instrument indicated a break. Plaintiff maintains that compliance with custom will not negative negligence, where it is not consistent with due care, and points out that the San Francisco Water Company did not rely on any such instrument as a leak detector, but immediately started excavating to determine if its pipe had broken and in the course thereof located the crack and leak in defendant's pipe.

Briefly, the facts upon which plaintiff relies as establishing the inference that the depression in the highway was caused by the cracks in defendant's pipe are that the depression was located almost directly opposite the break in defendant's pipe; that three days prior to the accident free water was seen flow-

ing from around the Pacific Gas and Electric Company's pipe into the hospital grounds indicating a possible condition of saturation underneath the highway in the fill; that the sidewalk and street had been gradually subsiding for a period of a couple of months prior to the accident, and that the gravel strip adjoining the sidewalk seemed continuously damp; and that the abrupt trough-like character of the hole in the roadway indicated a washing away of the underlying fill or the presence of a localized saturated condition and not an area of general subsidence.

Defendant on the other hand contends that any depressions in the highway were the result of the natural settlement of a deep fill; that if any water could have caused or added to the amount of settlement, said water was the 15.09 inches of rain which had fallen in the previous sixty-eight days. Defendant points out that the deepest part of the depression was eight or ten feet south of the crack in its pipe—or slightly uphill and that though the Pacific Gas and Electric Company pipe hole was north or downhill from the break it was approximately forty-five to fifty feet away, and the hole was one foot five inches above the bottom of its pipe. Therefore, any water flowing through said hole would have had to be the result of a considerable area of saturation. To indicate that such was the case, plaintiff referred to the fact that two months prior to the accident the sidewalk had subsided two inches; that one month prior thereto the gravel strip appeared constantly damp; and that one week before March 9, a saucerlike depression appeared in the highway eight inches in width and two inches in depth. Witnesses for the plaintiff testified that the depression became so noticeable March 7 and 8 that from the service station across the street, where they worked, they could see and hear passing cars bounce over the trough-like crack. One of said attendants testified that he drove over it himself on March 8 and found the hole so deep that he called it to the attention of the San Mateo police.

Defendant stated that the depression discussed herein was only one of many occurring in this portion of the highway. Plaintiff contended, however, that, with the exception of the general subsidence which occurred on the westerly side of the highway when the retaining wall there gave way, all depressions occurred in the immediate vicinity of and in-

cluded the hole with which we are here concerned. A witness for defendant stated that another subsidence took place south of the culvert arch in the spring of 1938. Plaintiff did not attempt to explain the cause thereof.

According to defendant, the inference which plaintiff seeks to establish as to the quantity of water which escaped from its pipe was rebutted by the direct testimony of its employee. The same employee who reported no break in the defendant's pipe on March 6, 1936, also testified as to the condition surrounding the break in the pipe when the same was uncovered. He testified that the ground was not saturated and that in making the excavation a shovel, bar and pickaxe were used. He testified that the leak was in the form of a split seam, spoken of as a "hair-crack", two and one-half inches long. Through it flowed water to the amount of one-half cupful per minute. The witness testified that eighteen inches down, the ground was damp but not saturated; that there was a small circle of water at the bottom of the pipe; that a small spray of water came out of the pipe; but that there was no open space beneath the crack—no dirt had been washed away. The pressure of the water in the pipe was admittedly forty to fifty pounds per square inch.

Defendant introduced testimony to the effect that if there were water draining from its pipe there was no evidence that it was flowing underneath the highway surface, but that the fact that water flowed out of the Pacific Gas and Electric Company pipe would indicate that it was flowing in an easterly direction; and as long as it was there stopped by the presence of the wall it would then have a tendency to flow northward in the downhill direction. Defendant contended that had the water settled to the bottom of the fill it would have drained out of the "weep-holes", four inch pipes installed in the culvert six feet apart, and would not have resulted in saturation of the fill. Testimony introduced by plaintiff, however, was to the effect that the water would first seep to the bottom of the fill, and that, though it might have a tendency to flow north (downhill), it would also reach a plane under the surface where its tendency to flow in all directions would be equal and the fact that the wall stopped the flow to the east would increase its tendency to flow westward under the highway.

■ We are of the opinion that the evidence here disclosed is capable of supporting more than one inference. "When an inference is supported by the evidence, and is not opposed to human experience and reason it cannot be disturbed by an appellate court." (10 Cal. Jur. 738.) Then resolving all conflicts in plaintiff's favor and indulging all reasonable inferences to uphold the verdict as we are required to do, we cannot but hold that the verdict of the jury is supported by sufficient evidence and therefore must be sustained.

■ There is no question but that the depression in the highway caused plaintiff's injuries. Because defendant was charged as being concurrently liable with the city of San Mateo in whose favor the trial court directed a verdict, defendant seeks to avoid any liability by pointing out that the proximate cause of the accident was the hole in the road, that the city was under a duty of care to repair said hole, that but for said lack of repair the injury would not have occurred and that thus the chain of causation between any alleged negligence of defendant and the injury was broken. This defense is not available to the defendant, however, for it has been held in this state that where the neglect of a defendant proximately causes an injury, said defendant is liable therefor despite the existence of another and concurring cause. (*Bosqui* v. *City of San Bernardino,* 2 Cal. (2d) 747, 764 [43 Pac. (2d) 547]; *Crabbe* v. *Rhoades,* 101 Cal. App. 503, 510 [282 Pac. 10].)

■ Defendant also contends that it is not liable for any defect in its pipe, even though the same caused plaintiff's injury where it did not have notice, and a reasonable opportunity to repair. Defendant is a private, not a public corporation, and as such liable for the damages caused by the defective and dangerous condition of its property. The distinction between the liability of such private corporations and public corporations has been discussed and set forth in the case of *Watson* v. *Alameda,* 219 Cal. 331, where at page 333 [26 Pac. (2d) 286] therein, the court said:

"Where a properly constructed street, e. g., falls into disrepair, knowledge or notice of its defective condition is conceded to be essential to fix liability. But, it is argued, where the affirmative act of responsible officers is directly carried out, as in new construction or improvement, this fact itself

gives rise to liability for any dangerous condition, notice being unnecessary. The effect of this distinction would be that the municipality would, in all governmental work on public streets, buildings, grounds, etc., be liable for the negligence of its employees, in the same manner as if the work were done in its proprietary capacity, that is to say, in the same manner in which a private corporation would be liable. But any such modification of the rule of nonliability for acts performed in a governmental capacity must come from the legislature, and the legislature has, in the act of 1923, set forth the extent of its departure from the former rule. The municipality is not, under this statute, liable in the same manner as a private corporation, for negligence of its employees; nor it is enough to show a dangerous condition of property. The municipality must have had notice and have failed to exercise its opportunity to remedy the condition. The theory of the act seems to be that liability is imposed not alone for the dangerous condition, but for the failure to remedy it, upon knowledge or notice thereof.''

██ As its final ground for this appeal, defendant urges that the doctrine of *res ipsa loquitur* had no application to the facts involved herein, and that the instruction given thereon constitutes reversible error.

The instruction complained of reads as follows:

''I instruct you that when a thing which causes injury is under control and management of a defendant and the accident is such as in the ordinary course of things does not happen if those who have the management use ordinary care, it affords reasonable evidence in the absence of explanation by the defendant, that the accident arose from want of ordinary care. Therefore if you find that the defendant water company had exclusive control and management of its water pipe, and that water was permitted to escape therefrom, then I instruct you that the escaping of said water from said pipe affords evidence in the absence of explanations, that it arose from a want of ordinary care on the part of said water company in the control and management of said pipe.''

Immediately following was the instruction that:

''As I have already instructed you, want of ordinary care or negligence on the part of the defendant must be a proximate cause of the accident before the defendant can be held liable.''

Defendant contends that the thing that caused the accident was a hole in the road; that the first sentence of the instruction was inapplicable because there was not even a claim that the road or any part of it was ''under the control and management of the defendant''; and that the second sentence assumed that the water escaping from defendant's pipe injured the plaintiff, a fact of which there was no evidence.

We cannot agree with these contentions. Since instructions generally are to be read together as a whole, certainly the component parts of the same instruction should be read together in order to ascertain if the whole correctly states the law. The first sentence of the instruction under consideration is only an abstract statement of the law. The second attempts to apply the principle of law to the present case. The instruction following informs the jury that unless the breaking of the pipe or the escaping water was the proximate cause of plaintiff's injuries, defendant is not liable.

Defendant admitted by its pleadings that it owned, maintained, controlled and operated the pipe in question. It maintains, however, that this control was not exclusive, since the pipes were laid in a public highway which was at all times under the control of the state. We see no merit in this argument. Certainly defendant owned and operated the pipe and was under a duty to maintain and control it. There is no showing that the state highway department ever exercised any control over the pipe other than in a supervisory capacity during its installation. The mere fact that permission would have to be requested from the highway department to open the gravel strip in which the pipe was laid would not take the pipe from defendant's exclusive control, especially where it was not shown that such permission was more than a mere formality or would ever be denied. In fact, it approaches absurdity to assume that said department would grant the initial right to install the pipe yet deny permission to operate it and keep it in repair.

Defendant asserts that since there was no evidence that a new pipe line installed such as this would not ordinarily spring a leak unless those in control of it were guilty of negligence, the instruction given was clearly erroneous. The courts in this state have often applied the doctrine of *res ipsa loquitur* in cases similar to, though not identical with this.

For instance, they have stated that in the absence of negligence, oil storage tanks ordinarily do not explode (*Phoenix Assur. Co.* v. *Texas Holding Co.*, 81 Cal. App. 61 [252 Pac. 1082]); the pipe sections, bricks, and mechanics' tools do not fall (*Michener* v. *Hutton*, 203 Cal. 604 [265 Pac. 238, 59 A. L. R. 480]); steam boilers do not explode (*Lippert* v. *Pacific Sugar Corp.*, 33 Cal. App. 198 [164 Pac. 810]); and automobiles do not collide with standing wagons (*Bauhofer* v. *Crawford*, 116 Cal. App. 676 [117 Pac. 931]).

Certainly it would not extend the doctrine to say that it is a matter of common knowledge that in the ordinary course of things water mains do not break if those having the management thereof use proper care.

It may then be said of the instant case that, in the absence of other explanations, a new ⅝-inch cast iron pipe, laid for a period of approximately five or six months for the purpose of carrying water, would not have burst if those in charge of its installation and maintenance had been free from negligence. The doctrine has in fact been applied to bursting water mains in the cases of *Buffums'* v. *City of Long Beach*, 111 Cal. App. 327 [295 Pac. 540], *Rainier Heat & Power Co.* v. *City of Seattle*, 113 Wash. 95 [193 Pac. 233], and *Esberg-Gunst Cigar Co.* v. *City of Portland*, 34 Or. 282 [55 Pac. 961, 75 Am. St. Rep. 651, 43 L. R. A. 435].

We therefore hold that the instruction was proper.

The foregoing disposes of the contentions of the defendant on this appeal, and necessitates an affirmance of the judgment, and it is therefore affirmed.

Curtis, J., Gibson, C. J., Shenk, J., York, J., *pro tem.*, and Moore, J., *pro tem.*, concurred.

Rehearing denied. Edmonds, J., voted for a rehearing.