[Civ. No. 6106. Third Appellate District—October 13, 1939.]

IDA P. WOODWARD, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Devlin, Devlin & Diepenbrock and Horace B. Wulff for Appellant.

John J. McMahon and Henry & Bedeau for Respondent.

MONCUR, J., *pro tem.*—This is an appeal from an order denying a motion for judgment for defendant notwithstanding the verdict of the jury and from the judgment entered upon the verdict of the jury in favor of the plaintiff for

damages for the death of plaintiff's husband, alleged to have been caused as a result of negligence on the part of an employee of defendant. Charles F. Woodward was the husband of respondent herein and at the time of the accident was in the employ of appellant, Southern Pacific Company, and was employed in interstate commerce. Therefore, the action is brought under the Federal Employers' Liability Act and under which act the courts of this state have concurrent jurisdiction.

Decedent Charles F. Woodward was crushed between two cars and fatally injured during switching operations in the yards of appellant railroad company in Sacramento. He was the foreman of the switching crew, and the other members were Charles Hand, engineer of the locomotive used in the switching operations; Carl G. Shea, fireman; A. M. Cunningham, switchman, and B. C. Downs, switchman. The two switchmen, Cunningham and Downs, were called as witnesses by the plaintiff and the defendant called the engineer and fireman as witnesses.

Foreman Woodward had been engaged in railroad work since about 1902 and had been employed continuously by appellant in the Sacramento yards from 1923 until the date of his death. He was an habitually careful, competent, capable and experienced switchman and was so regarded in the Sacramento yards. Also, the evidence shows that Woodward always gave clear, distinct signals. Engineer Hand became an engineer in 1919, but only worked as an engineer in the summertime; he had not worked in the Sacramento yards in ten years and had not worked as an engineer prior to the afternoon in question in any yard for the past five or six years. On the afternoon of the accident he was working as an extra engineer operating a superheater engine he was not shown ever to have operated before. He testified a superheater is quicker and more powerful than an ordinary saturated locomotive and that at the time of the accident he had been back at the throttle less than two hours with a crew with which he had not theretofore worked; that he was merely an extra man taking the regular engineer's place.

There is no substantial conflict in the evidence and the facts are as follows: Woodward, the deceased, was the foreman of the 3 o'clock P. M. shift of the 6th Street yard switching crew in the Sacramento yards of the appellant, and as such

foreman was in charge of the entire crew, including the engine crew. The foreman is the sole member of the crew who receives any instructions as to the switching operations to be conducted by the shift. His instructions are received by way of the switch list and oral instructions from the yardmaster. It is his duty to supervise the switching operations of freight trains in the Sacramento yards. The manner in which cars are picked up and switched in the make-up of trains lies entirely in the discretion of the foreman. The engineer and firemen have no knowledge of any switching movements and do not know what the next move will be. The engineer operates his engine solely upon signals from the foreman, when he is in a position to give signals, and, if not, upon the signals of the helpers. The engineer of a switching crew has no discretion whatsoever as to the movement of the engine and cars thereto attached, but his sole authority is to move said engine or cars pursuant to signals from the foreman.

Just prior to the accident the engine was pulling four cars easterly upon track No. 3, with switchman Downs riding the west end of car No. 1 (the car attached to the engine), switchman Cunningham was riding the west end of car No. 2 and foreman Woodward, the east end of car No. 3. All of said parties were riding on the right side, or engineer's side of said cars. As the engine and cars pulled out on track No. 3, Downs dropped off the train as his car passed switch No. 2, as he had been directed by the deceased shortly before the accident to align the lead to tracks Nos. 2 and 3 with track No. 2, so that the cars on the lead might be switched therefrom back to track No. 2.

As the engine came into the vicinity of the 6th Street shanty, situate adjacent to said lead track, Woodward gave a stop signal to the engineer, and then jumped off the car onto the ground, and, while the cars were still moving, uncoupled cars No. 2 and No. 3 by use of the lever. Both Cunningham and Woodward got off the cars onto the ground at about the same time, and the pulling of said lever caused cars No. 3 and No. 4 to be separated from cars No. 1 and No. 2 by the space of about 4 or 5 feet. As soon as Cunningham and Woodward got off the cars, Woodward said to Cunningham "Westbound", which, according to Cunningham's testimony, the latter understood to mean that the engine and two cars were

to be moved in a forward direction to the westbound main track.

When Woodward said "Westbound", Cunningham turned his back to Woodward, got on the second car and then moved over on said car (which was an empty flat car) to leave the stirrup free to Woodward to get on. By such movement, Cunningham's back was turned to Woodward and Woodward was not seen by him until the cars started in the backward movement and Woodward was being crushed between the couplers. At the time Woodward was last seen by Cunningham, he was standing 2 to 4 feet south of the cut, in the clear and in a safe position.

Switchman Downs watched the engine and cars from No. 2 switch until they stopped and then turned his attention to aligning switch No. 2, so the cars would operate on a back-up movement from the lead onto track No. 2 in lieu of track No. 3, with the result that neither of the helpers was in a position to see what occurred or what signals were given by Woodward after the cars stopped in the vicinity of the shanty. As to what transpired from the time Woodward was in the safe position 2 to 4 feet south of the cars until he was crushed between the couplers, the only witness was the engineer, Hand. The latter testified that after he received the signal from Woodward to back up, given slowly and methodically by Woodward, while Woodward was 2 to 4 feet south of the cars, he, Hand, then turned his head into the engine cab to release the air, reverse the engine and to slowly· open the throttle, and just as the cars and engine started backing he looked around, saw Cunningham on the car, heard a scream and immediately saw Cunningham give a violent stop signal. According to Hand's testimony, the train moved backward only 5 feet and, according to Cunningham's testimony, 6 or 6½ feet. Cunningham testified that when the train started to move backward, he turned and saw Woodward with his face directly toward the engine, with the coupler on the east car opposite his stomach and the coupler on the west car directly opposite his back. As a result of this movement, the two cars, No. 3 and No. 4, weighing approximately 100 tons, which were not braked in any manner, rolled back about 40 feet. In that vicinity the track was on a down grade, not uniform, of between two-tenths of one per cent and four-tenths of one per cent.

The testimony of the witnesses was to the effect that the rolling of the two unbraked cars for 40 feet from the described backward operation was usual and normal.

Engineer Hand testified that at the time the two cars between which foreman Woodward was crushed came together there was a very slight contact, if any; that he could not notice it; that there was not much of a contact; that he could feel a slight jolt; that he hadn't started to stop before he felt the jolt, and that the throttle was open and he was working the steam. E. D. Moody, trainmaster in the employ of appellant in the Sacramento yards, testified as follows:

"Q. Like the testimony in this case shows, these two cars were hit and knocked—in other words, the throttle of the engine according to the testimony, was still open when the cars came together,—is that the usual way of coupling on two cars? A. Not when the throttle is still open; if they moved five feet, they couldn't hit very hard. Q. It isn't the usual way to come up against standing cars with an engine and two cars, with the throttle open, is it? A. They have got to come up there with a closed throttle and drift into it. Q. Absolutely,—so when they come up and hit with the throttle open, that is unusual, isn't it? A. Yes."

The evidence is without conflict that when the second and third cars were uncoupled prior to the accident by the releasing of a lever, the knuckle on the east end of the third car was open and the knuckle on the west end of the second car was closed. There is absolutely no evidence in the record showing any reason why foreman Woodward should have gone in between these two cars at the time the accident occurred. The engineer demonstrated and repeated the back-up signal which he testified he had received from foreman Woodward. The demonstration was made in the presence of the other members of the crew in court, and they all testified that the signal which he demonstrated was the standard back-up signal and the one customarily used by foreman Woodward. Switchman Cunningham testified that the fourth car, in due course of switching movements, was to be kicked into track No. 2, and that it would have been a logical switching movement to have cut off No. 4 car and switched or kicked it into track No. 2, then to proceed with cars No. 1 and No. 2 to the westbound main; and that the foreman had the right

and power to, and does on occasions, change his mind as to the order of switching movements.

From the facts as shown, it is apparent that there was no· probable chance for any mistake as to the kind of signal which foreman Woodward gave.

At the conclusion of the evidence at the trial appellant moved for a directed verdict, which was denied. After verdict by the jury in favor of respondent, appellant moved in the alternative for a judgment for defendant notwithstanding the verdict of the jury and, in the event of a denial of said motion, for a new trial. These motions also were denied.

It is most earnestly contended by appellant that the court was in error in denying the said motions and, as a basis for support of such contention, asserts that there was insufficient evidence to submit to the jury the question of whether the engineer negligently backed the engine and cars without a signal, and in order to so hold it was necessary to disbelieve the testimony of the engineer in regard to the giving of the back-up signal; to draw an inference in conflict with the presumption that the ordinary course of business was followed; permit the jury to guess as to the real cause of the accident; hold that the jury could draw an inference upon an inference or presumption; that decedent's conduct in giving the signal and then going into the cut was the sole proximate cause of his death; and errors of the court in instructing the jury.

The federal statute prevails over state ·laws in the particular field to which the act applies, but in the absence of any controlling provisions in the federal statute, the state laws are controlling in all matters of practice and procedure. A late pronouncement upon this matter is found in the case of *King* v. *Schumacher et al., Trustees, etc.,* 32 Cal. App. (2d) 172, and therein at page 181 [89 Pac. (2d) 466], it is stated:

"Defendants make the further point that even though the law of this state is as stated in the decision in the Walton Case [*Walton* v. *Southern Pac. Co.,* 8 Cal. App. (2d) 290, 48 Pac. (2d) 108], it is contrary to the doctrine of reversal followed in like cases in the federal jurisdiction, and that this being an action based on a federal statute, the rule of the federal courts is controlling. In opposition to this view, plaintiff cites certain cases which he contends demonstrates that no substantial conflict exists between the doctrines of the two

jurisdictions. But whether or not such conflict does exist is not important, for the reason that it is well settled in both the federal and state jurisdictions, and the parties herein agree, that where as here an action founded on a federal statute is properly brought in the state courts, the law of the state, in the absence of any contrary provisions in the federal statute (and here there are none), is controlling in all matters of practice and procedure; and manifestly the process of determining on appeal whether error was committed by the trial court during the trial of the cause and if so whether such error is prejudicial and therefore constitutes ground for reversal, is a matter of practice and procedure. Referring to the judicial construction given those terms as they are used in the law, it has been said that together and in a larger sense they include the mode of proceeding by which a legal right is enforced, as distinguished from the substantive law which gives or declares the right (*Duggan* v. *Ogden*, 278 Mass. 432 [180 N. E. 301, 82 A. L. R. 765]; Anderson's Law Dictionary); whereas, singly, the word 'procedure' has been defined as the machinery for carrying on the suit, including pleading, process, evidence and practice, whether in the trial court or the appellate court, or in the processes by which causes are carried to the appellate court for review, or laying the foundation for such review (*Jones* v. *Erie R. Co.*, 106 Ohio, 408 [140 N. E. 366]), and the word 'practice' is said to be the form, manner or order of instituting or conducting a suit or other judicial proceeding through its successive stages to the end in accordance with the rules and principles laid down by law or by the regulations and precedents of the courts. (Black's Law Dictionary, citing among other cases *People* v. *Central Pac. R. R. Co.*, 83 Cal. 393 [23 Pac. 303], and *Kring* v. *Missouri*, 107 U. S. 221 [2 Sup. Ct. 443, 27 L. Ed. 506].) Here, admittedly the enforcement of the legal rights given and declared by said federal act is committed concurrently to the state courts, and the act does not attempt to attach any conditions to the practice and procedure through which the jurisdiction of the state courts shall be exercised in the enforcement of such rights. (*Taylor* v. *Southern Ry. Co.*, 350 Ill. 139 [182 N. E. 805].) It follows, therefore, that the hearing and determination of the cause, not only in the trial court, but also on appeal, must be had in accordance with the rules, principles and precedents governing the practice in the state

court. Moreover, a number of adjudicated cases might be cited in support of the conclusion reached herein. For example, the law of the forum has been held controlling with respect to non-unanimous verdicts (*Minneapolis & St. Louis R. Co.* v. *Bombolis,* 241 U. S. 211 [36 Sup. Ct. 595, 60 L. Ed. 961]; *Winters* v. *Minneapolis & St. L. R. Co.,* 126 Minn. 260 [148 N. W. 106]; see, also, cases cited in 12 A. L. R., note XI, p. 713); and as to the submission of a cause on special verdicts (*Chesapeake & O. Ry. Co.* v. *Meadows,* 119 Va. 33 [89 S. E. 244]; *Kansas City So. Ry. Co.* v. *Leslie,* 238 U. S. 599 [35 Sup. Ct. 844, 59 L. Ed. 1478]; *Union Pac. R. R. Co.* v. *Hadley,* 246 U. S. 330 [38 Sup. Ct. 318, 62 L. Ed. 751]); also as to the matter of directing a verdict (*Brenizer* v. *Nashville, C. & St. L. Ry.,* 156 Tenn. 479 [3 S. W. (2d) 1053, 8 S. W. (2d) 1099]; *Dutton* v. *Atlantic Coast Line R. Co.,* 104 S. C. 16 [88 S. E. 263]); and the entry of judgment *non obstante veredicto.* (*Marshall* v. *Chicago, R. I. & P. Ry. Co.,* 133 Minn. 460 [157 N. W. 638]; *Robertson* v. *Chicago, R. I. & P. Ry. Co.,* 180 Minn. 578 [230 N. W. 585].)

''It is true, of course, that a substantive right or defense granted by the federal act cannot be lessened or destroyed by a state rule of procedure or practice; but as already shown, unless the act itself modifies or changes those rules of procedure and practice, the cause must be heard and determined in the same manner as would like causes arising under the law prevailing in the state. (See 45 U. S. C. A., p. 262, note 443.)''

Thus it is seen that the law of the forum is controlling with respect to the matter of directing a verdict and the entry of judgment notwithstanding the verdict.

The questions involving the order of the court denying the motions for a directed verdict and for judgment notwithstanding the verdict have been before the state and federal courts under a great many different phases. The case of *Line* v. *Erie R. Co.,* 62 Fed. (2d) 657, appears to be very similar in its facts to the case herein. In that case one C. H. Line was killed in a railroad accident. He was the conductor of the train involved and, briefly, the facts were that the train, while proceeding eastwardly, came to a stop and conductor Line proceeded along the train to investigate. The trouble was found and conductor Line then sent the head brakeman forward to have the engineer call the flagman.

Conductor Line then turned as if to go to the caboose of the train and was not thereafter seen alive. Shortly after the train started conductor Line was struck and killed by some portion of the train, his body being found lying between the rails of the eastbound track. In that case there was a directed verdict and on the appeal the Circuit Court, in reversing the order of the court below said:

"By rule 591 the engineer was forbidden to start the train without receiving the customary signal from the conductor.

"The gravamen of the action is that the engineer started without such signal, when the deceased was under the thirty-sixth car either repairing or removing the defective brake rigging.

"As the train stood at Ashland hole the thirty-sixth car would have been approximately fourteen hundred and twelve feet east of Jerome Fork Bridge. There was naturally some divergence of opinion as to the exact spot where the body was found because those searching for it in the night (about 3 A. M.) were more interested in finding it than in determining its location. But there was substantial evidence that it was found about a quarter of a mile east of the bridge. There was also evidence that it was found a little nearer to Jerome Fork Bridge than to Stanch's crossing, the next highway crossing to the east. The distance from Jerome Fork Bridge to Stanch's crossing was three thousand seven hundred eighty-six feet. Either of these points would have been quite near the thirty-sixth car as the train stood at Ashland hole.

"There was evidence that a short distance, possibly ten feet, west of the body, a wrench and an air hose were found lying between the east and west bound main tracks and that deceased's cap was also nearby. Deceased did not have a wrench when he separated from Carder at the tenth car but he had had sufficient time to go to the caboose for one and return before the train started. The evidence tends to show that it was unnecessary to use a wrench to raise a fallen brake rigging but it was probably necessary to use one in removing the rigging altogether. A short distance west of the air hose the deceased's lantern, unlit, was found sitting on the ballast between the rails of the east-bound track. It was upright though slightly inclined from the perpendicular. Its bottom ring was bent but there was evidence that this was an old bend; otherwise the lantern was in good condition for it was

used by deceased's successor on the same night, after the accident.

"We think that this evidence, though circumstantial, is sufficient, if believed by the jury, to sustain a verdict in appellant's favor. *Western & Atl. R. R. Co.* v. *Hughes, Admx.*, 278 U. S. 496, 498, 49 S. Ct. 231, 73 L. Ed. 473. The evidence was more than a scintilla. *Hardy-Burlingham Min. Co.* v. *Baker*, 10 F. (2d) 277 (C. C. A. 6); *Begert* v. *Payne*, 274 F. 784, 788 (C. C. A. 6). It carried a justifiable rather than a mere possible inference. (*American Oil Co.* v. *Frederick*, 47 F. (2d) 54, 57, C. C. A. 6) that when the engineer started the train the deceased was under it and could not therefore have given the signal to proceed. Under the rules it was the duty of the conductor to inspect the train on his return from the tenth car to the caboose and if he found a brake rigging down on the thirty-sixth car under rule 520 it was his duty to see that it was removed and the jury might reasonably have concluded that at the time he was killed deceased was under this car performing that duty.

"Appellee introduced evidence tending to show that deceased gave the usual starting signal by lantern from the top of the train somewhere near the thirty-fifth or fortieth car from the engine, and contends that after the train started deceased fell between two of the cars to the track below.

"It will be noted that this is not a serious contradiction of appellant's evidence as to the whereabouts of deceased relative to car 36 at the time he was struck, but it does contradict the inference that he was under the car when the train started. As such it is of no consequence in determining the correctness of a directed verdict. *Gunning* v. *Cooley*, 281 U. S. 90, 94, 50 S. Ct. 231, 74 L. Ed. 720; *Richmond & Danville R. Co.* v. *Powers*, 149 U. S. 43, 47, 13 S. Ct. 748, 37 L. Ed. 642; *Rochford* v. *Penna. Co.*, 174 F. 81, 83 (C. C. A. 6); *Minneapolis, St. Paul etc. Ry. Co.* v. *Galvin*, 54 F. (2d) 202 (C. C. A. 6); *Begert* v. *Payne, supra*; *Howard* v. *Louisiana & A. R. Co.*, 49 F. (2d) 571 (C. C. A. 5)."

A petition for a writ of *certiorari* was denied by the Supreme Court. (289 U. S. 729 [53 Sup. Ct. 526, 77 L. Ed. 1478].)

Appellant contends that the presumption to the effect that a person is presumed to use ordinary care for his own safety, by reason of engineer Hand's testimony that a back-up

signal was given by foreman Woodward, became no longer applicable and disappeared from the case. However, under the facts of this case as compared with the facts in the case of *Line* v. *Erie R. Co., supra,* and under the legal effect of that decision, we think the presence of said presumption in the case becomes immaterial so far as said motions are concerned. It is, of course, not questioned that circumstantial as well as direct evidence may be considered in reaching a determination, and, therefore, omitting all consideration of the presumption, engineer Hand's testimony did no more than create a conflict with the evidence introduced on behalf of the respondent and, this being so, it became a matter for the jury to determine and it did not lie with the court to resolve this conflict on motions either for a directed verdict or for a judgment for appellant notwithstanding the verdict.

We are unable to see how any other conclusion can be reached unless we hold that by the mere fact that engineer Hand did so testify the court was thereby warranted in taking the case from the jury. To so hold would, we think, be a clear invasion of the province of the jury, the duty of determining the weight and effect of the evidence, its sufficiency in proving any fact for which it is offered, and also the duty of the jury in determining the credibility of the witnesses.

Foreman Woodward was deceased and consequently it was not possible to refute the testimony of engineer Hand in regard to the giving of the back-up signal. Under somewhat similar circumstances regarding the weight to be given to a witness' testimony, in the case of *Lippert* v. *Pacific Sugar Corp.,* 33 Cal. App. 198, 212 [164 Pac. 810], where a workman was killed in the explosion of a boiler and the testimony of the master mechanic was involved, the court said:

"We do not think the jury were compelled to accept at its face value the testimony of Connolly as to verbal instructions or conversations with Lippert, who being dead could not explain or refute them. Connolly may not intentionally have misstated any fact, but his memory may have been at fault. Evidence of alleged declarations of deceased persons is always more or less unsatisfactory, and the unsupported testimony of a single person as to a conversation between himself and a deceased person is regarded as the weakest of all kinds of evidence. (*Mattingly* v. *Pennie,* 105 Cal. 514 [45 Am. St.

Rep. 87, 39 Pac. 200]; *Austin* v. *Wilcoxson,* 149 Cal. 24 [84 Pac. 417].)''

In the case of *Crain* v. *Illinois Cent. R. Co.,* 335 Mo. 658 [73 S. W. (2d) 786], in which a petition for a writ of *certiorari* was denied by the United States Supreme Court (293 U. S. 607 [55 Sup. Ct. 123, 79 L. Ed. 698]), and which was an action under the Federal Employers' Liability Act, the court, after citing with approval and following numerous cases of the United States Supreme Court, said:

''If there is a conflict in the evidence or inferences a verdict should not be directed. (*Atchison T. & S. F. Ry. Co.* v. *Condos* [C. C. A.], 30 F. (2d) 669, 670.)''

And also:

''The credibility of the witnesses, the interpretation of testimony, and 'the weight of evidence and the extent and effect of contradiction', present questions for the jury.''

Under all of the facts and circumstances shown by the evidence in this case, if the court is vested with the authority to say, in the first instance, that the testimony of engineer Hand is clear, positive, uncontradicted and not open to doubt, it would, in effect, be a denial of the constitutional right to a trial by jury.

We are satisfied that the court was correct in its denial of the motion for a directed verdict and of the motion for judgment for defendant notwithstanding the verdict of the jury.

The other grounds for reversal will be considered under the appeal from the judgment. We are satisfied the evidence is sufficient to support the judgment and unless there were erroneous instructions given at the request of the respondent and error in refusing the instructions requested by appellant resulting in prejudice to its rights, the judgment should be affirmed. Appellant contends that the trial court erred in instructing the jury upon the question of presumption of due care. In connection with the giving of similar instructions in cases of this kind, many cases, both federal and state, have been cited. ■ The law is established in California that where the evidence introduced by plaintiff discloses the act and conduct of the injured party immediately prior to and at the time in question, this presumption has no place in the case. (*Campbell* v. *City of Los Angeles,* 28 Cal. App. (2d) 490 [82 Pac. (2d) 720]; *Mundy* v. *Marshall,*

8 Cal. (2d) 294, 296 [65 Pac. (2d) 65]; *Lindley* v. *Southern Pacific Co.*, 18 Cal. App. (2d) 550, 556 [64 Pac. (2d) 490]; *Varner* v. *Skov*, 20 Cal. App. (2d) 232, 240 [67 Pac. (2d) 123]; *Engstrom* v. *Auburn Automobile Sales Corp.*, 11 Cal. (2d) 64 [77 Pac. (2d) 1059]; *Paulsen* v. *McDuffie*, 4 Cal. (2d) 111 [47 Pac. (2d) 709].)

 The following instruction regarding presumptions was given by the court at the request of respondent:

"Under the law there is a presumption that at the time and place in question, the deceased Woodward took ordinary care for his own concerns, and that he didn't heedlessly go between the cars, and that he did not see or know of the danger, if any, closing in upon him. It is for the jury to determine from all the evidence, including this presumption, whether defendant's employees were negligent, and if so, whether this negligence, if any, was the proximate cause or a contributing cause of Woodward's death, or whether he assumed the risk as incident to his employment."

Appellant contends by this instruction the jury was authorized to make a finding of negligence on the part of appellant from the presumption that the decedent took ordinary care for his own concern, and directed that said presumption has sufficient force and foundation to impute negligence to appellant and that respondent was thereby released from her normal and usual burden of proof that appellant was negligent and that said negligence was the proximate cause of the injuries. We are unable to give this instruction the effect contended for by appellant.

In other instructions the jury was told that there was no burden upon the appellant herein to disprove the allegations of the plaintiff's complaint but that the burden of proof of negligence rested upon the respondent; that proof must be made by a preponderance of evidence; that if the weight of the evidence bearing upon the whole case is in favor of the defendant, or that if it were evenly balanced that the plaintiff could not recover; that the jury was not to determine the case arbitrarily or through prejudice but to weigh it over carefully and consider it carefully and to take in consideration all the circumstances, all of the evidence in the case and then to determine what the truth was and how much weight, or how little, they should give to the testimony of any witness; that appellant was not liable for loss simply because a loss

may have occurred without fault on its part, that on the contrary, liability could be imputed to defendant only if it had been negligent and if its negligence had proximately caused the damage; that if they found that the accident which resulted in the death of foreman Woodward may have resulted from any one of several causes, for some of which appellant was responsible and for some of which it was not, then it was not within the province of the jury to guess between these various causes but under such circumstances their verdict must be in favor of appellant and against respondent.

Assuming that the back-up signal was given, still from that time until the outcry was heard and foreman Woodward was next seen between the couplers of the cars, there is no testimony showing his actions. Surely then, the presumption of due care applied during that *interim*. In the case of *Pitt* v. *Southern Pac. Co.*, 121 Cal. App. 228, 232 [9 Pac. (2d) 273], a case under the Federal Employers' Liability Act, and in which a new trial was granted, the court said:

"Respondent's argument on this branch of the case is that inasmuch as appellant proved the conduct of the deceased immediately before the accident which resulted in his death he was not entitled to the presumption that a person takes ordinary care for his own safety. (Code Civ. Proc., sec. 1963, subd. 4.) There was no eye-witness to the actual crushing of deceased, and appellant did not prove or establish directly, why deceased went between the cars or what was his purpose at the very time of the accident. He was entitled to the presumption as evidence that he did not heedlessly go between the cars, and that he did not see or know of the danger closing in upon him. It was then a matter for the jury to determine from all the evidence, including the presumption, whether the respondent's employees were negligent, and whether this negligence, if any, was the proximate cause of Shaw's death, or whether he had assumed the risk as incident to his employment, that is, whether the accident was caused by an ordinary risk, or if extraordinary, whether he assumed it."

Again in the case of *Thornton* v. *Seaboard Air Line Ry.*, 98 S. C. 348 [82 S. E. 433, 435], which also was a case under the federal act, the court said:

"As has been said, there are no eye-witnesses to the killing. There is nothing proven by eye-witnesses as to whether the

negligence of defendant, or negligence of deceased, or his contributory negligence, caused the accident. The evidence shows deceased was in a normal condition of mind when he left to inspect the cars, and there is no suggestion that he committed suicide. In the absence of proof to the contrary, the presumption is that he was attempting to carry out the duties of his employment, for which he had contracted, with due care and precaution.''

The trial court also instructed the jury, at the request of respondent, regarding presumptions, as follows:

''A presumption is evidence, and may, in certain cases, outweigh positive testimony adduced against it. Against a proved fact or a fact admitted, a disputable presumption has no weight, but where it is undertaken to prove the fact against the presumption, it still remains with the jury to say whether or not the fact has been proven, and if the jury is not satisfied with the proof offered in its support, then the jury is at liberty to accept the evidence of the presumption.''

This statement of the law regarding presumptions is found in the case of *People* v. *Milner*, 122 Cal. 171, 179 [54 Pac. 833], and is cited with approval in the case of *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540 [299 Pac. 529]. In the latter case the court said:

''That a presumption is evidence and may in certain cases outweigh positive evidence adduced against it has long been the settled law of this state.''

Under the decisions of this state, therefore, the instruction was proper, but it is contended by appellant that these instructions are not warranted under the decisions of the federal courts, and many federal cases in support of this contention are cited. We quote from one of the cited cases, *Ariasi* v. *Orient Ins. Co.*, 50 Fed. (2d) 548, the Ninth Circuit Court of Appeal, per Wilbur, J., presiding, at page 522, as follows:

''The question as to the effect of positive evidence controverting a disputable presumption has been recently before the Supreme Court of California in the case of *Smellie* v. *Southern Pacific Co. et al.*, 269 Pac. 657, thrice reheard, 276 Pac. 338, 287 Pac. 343 [212 Cal. 540], 299 Pac. 529. It was there held that the presumption that a person exercises due care for his own safety was substantive evidence to be weighed against the testimony introduced concerning his conduct, tending to contradict the presumption. See, also *Mar*

*Shee* v. *Maryland Assurance Corp.,* 190 Cal. 1, 210 Pac. 269, and cases there cited. This conclusion, so far as it is predicated upon the statutory law of California, is not controlling in the federal courts, where the rule has been established to the contrary in *Western & A. R. R.* v. *Henderson,* 279 U. S. 639, 643, 49 S. Ct. 445, 447, 73 L. Ed. 884.''

In *Western & A. R. R.* v. *Henderson,* 279 U. S. 639 [49 Sup. Ct. 445, 73 L. Ed. 884], there was involved a statute of Georgia to the effect that:

''Upon the mere fact of collision and resulting death, the statute is held to raise a presumption that defendant and its employees were negligent in each of the particulars alleged, and that every act or omission in plaintiff's specifications of negligence was the proximate cause of the death; and it makes defendant liable unless it showed due care in respect of every matter alleged against it. And, by authorizing the jury, in the absence of evidence, to find negligence in the operation of the engine and train, the court necessarily permitted the presumption to be considered and weighed as evidence against the testimony of defendant's witnesses tending affirmatively to prove such operation was not negligent in any respect.''

In the Ariasi case above cited it was further said:

''The trial court entered judgment that plaintiff take nothing by his action. It appears from the memorandum opinion of the trial court in the record that the trial court was of opinion that the *prima facie* case established by the revocation of appellant's permit was not overcome by appellant's evidence. While we have referred to the opinion as indicating that the trial court discredited the testimony of the appellant, this result is to be inferred also from the judgment. The appellant concedes, as he must do in view of our previous decision, that the order revoking the permit establishes *prima facie* that the liquor destroyed by the fire in question was illegally possessed, and hence not property within the meaning of the law and the insurance policy. But he contends that this presumption merely required him to go forward with his proof, and that, having done so, the presumption is at an end, citing *Western & A. R. R.* v. *Henderson,* 279 U. S. 639, 642, 49 S. Ct. 445, 73 L. Ed. 884; *Mobile etc. R. Co.* v. *Turnipseed,* 219 U. S. 35, 43, 31 S. Ct. 136, 55 L. Ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463. The revocation of the permit upon the ground stated, in the absence of other testi-

mony, established the fact that the liquor was illegally possessed by appellant. The question is whether or not this evidence is overcome by the affirmative evidence introduced by the opposing party. In this connection, appellees seem to admit that the *prima facie* case is met and overcome by adverse testimony, but point out that they do not rely wholly upon the *prima facie* case arising from the order of revocation itself, but that this proof has been supplemented by the findings of the assistant prohibition director, approved and adopted by the prohibition director, which disclose the facts upon which the order was based and show that an illegal sale of intoxicating liquor had been made by the appellee upon the premises involved herein. . . .

"The question for our consideration then is, Did the testimony of the appellant, directly controverting this *prima facie* evidence of illegal possession, require the trial court, as a matter of law, to find the facts to be as he testified them to be? Although it is a fundamental rule of law that a trial court is not required to accept the testimony of any witness as true, but must weigh the testimony of such witness in connection with all the other evidence in the case and determine the truth, in the absence of all contradictory evidence and any inherent improbability in the testimony, the court cannot arbitrarily reject the testimony of a witness whose testimony appears credible. It is unquestionably true that, if the witnesses who appeared before the assistant prohibition director and testified as above indicated had appeared before the court on the trial of this action and had again so testified, their testimony, being in direct conflict with that of the appellant, would sustain the judgment. They did not testify. The record admitted is not primary evidence of the truth of the testimony therein set forth, nor of the facts stated in the record."

Under the facts in the instant case, however, it is seen that respondent did not depend upon the presumption of due care or of its effect, but presented evidence of circumstances sufficient to establish a *prima facie* case, and there was no dependence in the first instance upon the presumption itself to establish her right to recover. Therefore, the Ariasi case, the Henderson case, and the many other cases involving the application of the rule regarding the presumption of due care cited therein as held under the federal decisions can

hardly be said to be determinative as applied to the facts in the instant case.

Under the laws of this state, as under the laws of federal procedure, negligence is not presumed and the burden of proving negligence devolves upon the party alleging it. Therefore, what is said in the Henderson case and the other cases involving similar statutory provisions must be considered in connection with those particular provisions attempting to place the burden upon the party against whom the negligence is alleged. Whether we call this presumption evidence, as under the state law, or it be given some other designation, as claimed under the federal laws, nevertheless, in proper cases a presumption is in the case and before the court and jury until the state of the evidence establishes its inapplicability or that by reason of the testimony introduced it has disappeared and cannot be considered. In this view of the state statutes and decisions and of the federal statutes and decisions thereunder, there is substantially no difference in the effect to be given to these disputable presumptions when applied to the evidence herein. We are of the opinion that under the facts of the instant case the instructions concerning presumptions were proper to be given.

Furthermore, it may be questioned in connection with the giving of the instructions concerning presumptions whether appellant is in a position to complain. At its request the court gave the following instruction:

"The law presumes that the ordinary course of business was followed by the defendant Southern Pacific Company and its employees in making the switching movements prior to and at the time of this accident, and such must be presumed by you, unless controverted by other evidence."

The defenses of contributory negligence and assumption of risk, under the evidence herein, may be considered together. If the accident occurred in the manner described by engineer Hand, unquestionably appellant and engineer Hand were not guilty of any negligence proximately causing the fatal injuries to foreman Woodward and there would be no liability in any event. On the other hand, if no back-up signal were given and the engineer made the backward movement without any signal being given, unless there was a violation of rules or some other intervening act on the part of foreman Woodward proximately causing or contributing to the acci-

dent, the evidence being conflicting, the jury was justified in finding, by its verdict, that appellant was negligent; that foreman Woodward was not negligent; that he did not assume the risk and that appellant's negligence was the sole proximate cause of the accident. The backing of the train without a signal of any kind being given, under the circumstances shown in evidence, would have been a movement which foreman Woodward could not reasonably have anticipated and, in consequence, it would not have been an ordinary risk incident to his employment nor could it have been an extraordinary risk which he could be held to have assumed. And again referring to the presumption that the ordinary course of business was followed, as such presumption may be applied to the defense of contributory negligence, this being a defense necessary to be established by appellant unless such defense is shown by the evidence of respondent, the application of these presumptions where the defense of contributory negligence is involved, is discussed in the case of *Larrabee* v. *Western Pac. Ry. Co.*, 173 Cal. 743 [161 Pac. 750]. Therein at page 746 the court said:

"What then is to be said of the conduct of the deceased? Respondent contends that the question whether that conduct did or did not constitute contributory negligence is peculiarly and exclusively a question of fact for the jury. And herein it is said, first, that the jury was at liberty to infer that the deceased exercised ordinary care and diligence. (Code Civ. Proc., sec. 1963, subd. 4; *Gay* v. *Winter,* 34 Cal. 153; *Baltimore P. R. Co.* v. *Landrigan,* 191 U. S. 462 [48 L. Ed. 262, 24 Sup. Ct. Rep. 137].) In the latter case the court had instructed the jury that 'in the absence of all evidence tending to show whether the plaintiff's intestate stopped, looked, and listened before attempting to cross the south track, the presumption would be that he did'. Respondent invokes this evidentiary presumption to rebut contributory negligence, and to establish that the deceased did all things which should be done by a prudent man situated as he was. It is true that in by far the greater number of cases the question of contributory negligence is, as it has been frequently declared to be by this court, a question of fact for the determination of the jury, and it becomes a question of law only 'when the evidence is such that the court is impelled to say that it is not in conflict on the facts, and that from these facts a reasonable man can

draw but one inference, and that an inference pointing unerringly to the negligence of the plaintiff contributing to his own injury'. (*Zibbell* v. *Southern Pacific Co.*, 160 Cal. 237 [116 Pac. 513].) But touching the presumption that the deceased exercised ordinary care, it is to be noted that that presumption is given weight only in the absence of evidence on the subject of the deceased's conduct. It has been declared to be 'an artificial presumption of so weak a character that it is not to be allowed to have the effect of evidence before the jury where the uncontradicted evidence of the circumstances attending the accident overthrows it'. (Thompson on Negligence, sec. 401.) ''

Appellant relies upon the testimony of engineer Hand as to what occurred from the time he testified the back-up signal was given until deceased was seen between the couplers. Therefore, it would appear that there was no place in the case for the presumption that the usual course of business was followed. But if this presumption that the usual course of business was followed may be held to apply to that *interim* following the giving of the back-up signal to the instant when foreman Woodward was seen between the couplers, the presumption would be that foreman Woodward followed the usual course of business, whatever it may have been. Then the presumption that he used due care for his own safety during that *interim* also applied. The testimony of engineer Hand solely as to the giving of the back-up signal, like presumptions, considered in connection with the fact that foreman Woodward was dead, is classed as weak testimony. Therefore, from the whole case it appears clear that the duty of determining the weight of the evidence, the credibility of the witnesses, and of resolving the conflicts in the evidence was one solely for the jury.

Concededly, the jury could not arbitrarily disregard engineer Hand's testimony nor could they disregard it because he was an employee of appellant and a participant in the switching movements which occasioned the accident, but the trial court and the jury saw him on the witness stand and heard him testify. We cannot assume that the jury did not follow the instructions of the court in reference to the rules of law to be used by them in determining the credibility of the witnesses and the weight to be given to their testimony,

their motives, and the interest, if any, and their relation to the case, together with all of the circumstances appearing before them.

In connection with the instructions concerning presumptions, it would perhaps have been more advisable to so word them as to conform to the federal rules in regard to such instructions, but, under the evidence and the circumstances herein appearing, there was no error committed in so instructing the jury in the form in which the instructions were given of which the appellant is in a position to complain.

The jury having resolved the conflicts in favor of respondent and against appellant, this court is precluded from interfering with the determination of the jury in respect to these two defenses. We are not persuaded that there is any merit to the contention of appellant that the jury were instructed to or that they did, in arriving at a verdict herein, draw inferences from inferences or inferences from presumptions, and we therefore deem a discussion of this point unnecessary to a decision herein.

It is further contended by appellant that there was such a violation of the rules of the appellant Railroad Company as to preclude a recovery and that the court committed error in refusing to give an instruction covering this alleged violation of the rule. The instruction proposed was as follows:

"I hereby instruct you that the proof in this case shows that the defendant Southern Pacific Company promulgated for the safety of its yard employees the following rule:

" 'Employees . . . must not . . . go between moving cars, or between engines and cars in motion. . . . When necessary to change the alignment of couplers, cars must be stopped, and under no circumstances, must attempt be made to adjust couplers with foot or hand, or raise lock pin by hand, while cars are moving.

" 'If necessary to make change or repairs to couplers, the action must be understood by all employees who may, through misunderstanding, move or cause cars to be moved; the cars should be separated not less than one car-length to reduce liability of injury, should they be moved by mistake. Employees should, when possible, avoid standing directly in line with couplers while making repairs.'

"And if you find that if Charles F. Woodward had obeyed and performed said rule the said accident would have been avoided and if you further find that his disobedience thereto was the sole efficient cause of his death, then I instruct you that your verdict must be in favor of defendant and against plaintiff."

Evidence was introduced at the trial for the purpose of showing the construction placed upon this rule by the employees at the time of the accident. The rule itself seems to be quite plain and it may be questioned as to whether there is any necessity for such evidence, but, however that may be, it does not appear to be material when considered in connection with the evidence in this case. As has been said, the couplers were open and in good condition. A change in the alignment of the couplers apparently was not necessary, neither was it necessary to make changes or repairs to the couplers, and, therefore, there was no necessity of separating the cars at least one car length or for standing directly in line with the couplers while making repairs. To change couplers could mean nothing less than to put others in their places, and repairs would only be necessary when the couplers were out of order. Under these circumstances, the instruction assumes a state of facts not shown by the evidence. This instruction told the jury that if the deceased had obeyed and performed said rule the said accident would have been avoided, and then told the jury that if they so found their verdict must be in favor of the defendant and against the plaintiff. We are satisfied, therefore, that the court was correct in refusing to give this instruction.

A second cause of action was set forth in the complaint, but, as there was no evidence to substantiate it, it was withdrawn from the jury and any issues in connection with it are not before this court for consideration.

We have, we believe, considered all of the questions raised by this appeal and necessary to a determination. The case was carefully and fairly tried, the judgment is supported by the evidence, and we find no error in the record prejudicial to any of the rights of appellant. Therefore, the order denying the motion of defendant for judgment notwithstanding the verdict of the jury and the judgment are hereby affirmed.

Tuttle, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 11, 1939. Carter, J., did not participate.