[Civ. No. 35048. Second Dist., Div. Five. May 28, 1970.]

GEORGE C. BOHME, SR., Plaintiff and Respondent, v.
SOUTHERN PACIFIC COMPANY, Defendant and Appellant.

## Counsel

Randolph Karr, William E. Still and Norman T. Ollestad for Defendant and Appellant.

G. Morgan Fitzwater for Plaintiff and Respondent.

## Opinion

**FRAMPTON, J.***—

### Preliminary Statement

Defendant, Southern Pacific Company, appeals from a judgment in favor of plaintiff awarding damages in the sum of $86,418. The judgment is entered upon a jury verdict finding total damages in the sum of $96,020, but reducing this amount by 10 percent based upon a finding of that percentage of negligence attributable to plaintiff. Plaintiff's action was brought under the provisions of the Federal Employers' Liability Act to recover damages for injuries sustained as a result of a fall from a ramp or walkway suspended between two locomotive engines in defendant's repair yard. Defendant's motion for a new trial was denied and this appeal followed.

### Statement of Facts

On January 14, 1967, at approximately 8:30 a.m., in the "Taylor Diesel Ramp" at Los Angeles, California, owned and operated by defendant, plaintiff, then 67 years of age, was employed by defendant as an electrician working on steam generators. He had been employed in this line of work by defendant for approximately 17 years next preceding the date of the accident.

Plaintiff started work at 7 a.m., inspected several locomotive units, then began work on Unit 3, near which he was later injured by a fall at approximately 8:30 a.m.

Shortly before his fall, plaintiff was working on a diesel locomotive designated as a "B" unit, the rear end of which was connected to another diesel locomotive designated as an "A" unit. These units were being repaired and were coupled together. Between the units, starting from the ground up were the couplers, on top of the couplers were buffer plates or buffer bars, and then on top of the buffer plates or buffer bars was an apron of steel, which

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

constituted the walkway plate between the two units. Along each side of the walkway there is a chain which, when hooked up, comes to about halfway between the thigh and waist. The coupled units were stationary at all times both before and after the accident.

Just before the accident, plaintiff had been talking with a Mr. Noble who was also an employee of defendant. This conversation took place in back of the steam generator on the "B" unit upon which plaintiff was working at the time. Because the steam generator coils had recently been cleaned, there was water and oil on the floor all around the steam generator upon which plaintiff was working. Plaintiff decided to talk to Harold Betts, a machinist employed by defendant, who at that time was working in unit "A." Plaintiff left unit "B," walked across the walkway of steel plate which connected the two units and over to unit "A." The walkway between the coupled units is approximately 30 inches wide and between 20 and 36 inches in length.

Plaintiff did not notice whether or not the safety chains were up or down along the walkway between the two units when he first walked from unit "B" to unit "A" because they are generally up. Upon arrival at unit "A" he had a short conversation with Mr. Betts, and then turned back to see Mr. Noble again.

The testimony as to how the accident occurred is, as usual, in conflict. Plaintiff's version of what happened after he turned back to see Mr. Noble is "I stepped out and gave a glance to see if anybody was passing or looking, thinking Mr. Noble would pass, and when I stepped out I slipped and lost my balance which threw me over to my right and before I knew what happened, I was down in the bottom of the pit." The safety chain was down, according to plaintiff, otherwise it would have stopped him from falling. It appears to have been the custom and practice to leave the chain down until the units are finally made up for road service, at which time they would be connected up along with air hoses and electrical lines. Plaintiff fell a distance of seven feet, nine inches from the walkway to the lower level of the concrete ramp.

The evidence disclosed that the deck plates of the units are generally very oily, dirty and covered with road scum as they were at the time of plaintiff's accident. The oil comes from the top deck of the diesel engine and is tracked through the units "from the traffic of the workers going back and forth." It is customary for the workers to go back and forth between the units using the walkway hereinabove referred to. A crew of laborers was available at the time of the accident to clean up this condition.

There is testimony in the record to the effect that shortly after the accident, two employees of defendant observed wet footprint marks and slide marks outside the walkway area out on the grabiron and buffer plate area of

the locomotive. The work rules of defendant prohibit an employee from stepping out between locomotive units in such manner as to place the employee in an area outside the walkway, unless such employee is actually engaged in the repair of apparatus situated between the units. The footprint observed bore markings similar to those which could be made by the type of shoe worn by plaintiff but other employees also wore a similar type of shoe.

Plaintiff suffered a fracture of the distal part of the tibia, multiple fractures of the lower part of the fibula, and a fracture of the medial malleolus. The major tibia fragment was sticking through the skin three inches, was completely bare, and was covered by dirt and grime. There was tremendous comminution of this fracture, described by the treating doctor as "a bag of bones." Numerous fragments were broken off from the medial malleolus and large amounts of bone were missing from the cancellous portion. An operation lasting two hours was necessary to attempt to align the bone fragments.

There were three operations in all; the first on January 14, 1967, a second on May 23, 1967, which lasted three and one-half hours, and a third operation on August 29, 1967, when various steel pins placed into the fracture site during the second operation were removed.

A steel band to keep some of the many fragments in place was left in the leg and was still there at the time of trial (September 23, 1968). The removal of this band may require a fourth operation at the cost of from $3,000 to $4,000.

There was a fracture into the ankle joint. This creates a type of defect which produces continuous pain and which can be alleviated only by a fusion of the ankle joint. In a man the age of plaintiff there is a strong probability that a fourth operation will be necessary to fuse the ankle joint in order to relieve the area from constant pain. Post traumatic arthritis was observed at the second operation.

The testimony of the treating doctor disclosed that plaintiff's condition is permanent, it is painful, and he will no longer be able to work as an electrician for defendant. Prior to the accident plaintiff was in good health.

### Contentions on Appeal

Defendant urges that (1) it was prejudicial error for plaintiff's counsel to interject, on *voir dire* examination of prospective jurors, over objection, the fact that plaintiff did not qualify for workmen's compensation benefits under California law; (2) the trial court erroneously instructed the jury that plaintiff was not subject to nor covered by the rights, liabilities or rules of the Workmen's Compensation Act of the State of California, nor was he

entitled to any benefits thereunder, and (3) the damages awarded are excessive and indicate that the jury acted through passion and prejudice.

### Voir Dire Examination of Jurors

Over the objection of defendant's counsel, plaintiff's counsel was permitted to ask of prospective members of the jury, in substance, whether or not such juror understood that plaintiff's case is brought under federal law, the Federal Employers' Liability Act, which affords railroad employees their only remedy for damages for personal injuries which occur in the course of their employment, that such employees are not protected under the Workmen's Compensation Act of California and receive no benefits under such law.

In *Eichel* v. *New York Central R. Co.*, 375 U.S. 253 [11 L.Ed.2d 307, 84 S.Ct. 316], an action brought under the Federal Employers' Liability Act, it was held that the likelihood of misuse by the jury of evidence that plaintiff was receiving disability pension payments under the Railroad Retirement Act of 1937, clearly outweighs the value of this evidence, where the evidence was offered for the sole purpose of establishing malingering on the part of plaintiff.

In *Tipton* v. *Socony Mobil Oil Co.*, 375 U.S. 34 [11 L.Ed.2d 4, 84 S.Ct. 1], reh. den. 375 U.S. 936 [11 L.Ed.2d 268, 84 S.Ct. 328], an action brought under the Jones Act, it was held to be error to admit evidence that plaintiff had accepted benefits under the Longshoremen's and Harbor Workers Compensation Act as applied through the Outer Continental Shelf Lands Act where such evidence was not limited by a cautionary instruction to the jury, to the sole question as to what plaintiff thought to be his legal status, that is, a seaman or a longshoreman, plaintiff being an offshore drilling employee.

In an action for personal injuries sustained as a result of a collision between a truck being driven by plaintiff, an employee of the Iroquis Gas Corporation, and a railroad train, owned by defendant and being operated by its employees, it was held reversible error to admit testimony that plaintiff had been awarded compensation under the New York Workmen's Compensation law, and that the amount awarded to him had been paid by his employer. (*Plough* v. *Baltimore & O. R. Co.*, 164 F.2d 254.) To the same effect, see also *Altenbaumer* v. *Lion Oil Co.*, 186 F.2d 35, and *Gladden* v. *P. Henderson & Co.*, 385 F.2d 480; *Schroeder* v. *Pennsylvania R.R. Co.*, 397 F.2d 452, 457. Bringing the question of the receipt of a railroad pension before the jury has been held to be prejudicial error. (*Page* v. *St. Louis Southwestern Ry. Co.*, 349 F.2d 820; *Caughman* v. *Washington Terminal Co.*, 345 F.2d 434; *Aylor* v. *Intercounty Construction Corp.*, 381 F.2d 930, 934.)

In *Kodack* v. *Long Island R.R. Co.,* 342 F.2d 244, 247, an action brought under the Federal Employers' Liability Act, plaintiff's counsel remarked, in his opening statement to the jury, "At the very outset I desire that you know that Harold Kodack brings this action against Long Island Rail Road Company under the Federal Employers Liability Act. He has no compensation rights . . . ." At this point he was interrupted by an objection from opposing counsel who moved for a mistrial. The motion was denied, but the jury was admonished to disregard the remark. The circuit court held that while it was inexcusable for counsel to make such a remark to the jury, the remark itself was not so prejudicial under the circumstances as to justify a reversal.

Except for *Kodack,* all of the foregoing cases cited and relied on by defendant simply hold that evidence of receipt of collateral benefits by a plaintiff in an action brought under the Federal Employers' Liability Act bears upon a matter not in issue in such a case and should be excluded. Such cases are of little or no help in resolving the question here under consideraiton.

In *Snyder* v. *Lehigh Valley R.R. Co.,* 245 F.2d 112, an action brought under the Federal Employers' Liability Act, cited by defendant, the jury, after retiring to deliberate upon a verdict, sent the trial judge a written inquiry as to whether plaintiff was receiving workmen's compensation. The trial judge, without notice to counsel, orally instructed the marshall to advise the jurors that the answer to their question was in the negative. The jury, either from incompetence or confusion, returned the following verdict: "Well we the jury unanimously agree that the defendant nor plaintiff is guilty of negligence. The jury also awards the sum of $5,000 and a life job at a guaranteed yearly wage to the plaintiff, Mr. George Snyder." (P. 114.) In response to an inquiry from the trial judge as to the verdict, the forelady of the jury stated (p. 114): "[W]e just decided it was a freak accident." The circuit court, in reversing, commented that the trial judge's reply to the jury's inquiry amounted to testimony given after the case was closed, with no opportunity to either counsel to object to its admission on the ground of irrelevancy, and had the effect, under the circumstances, of giving judicial sanction of an issue which was not only irrelevant but foreign to the basic question of negligence which the jury was to decide.

■ Where an action founded on a federal statute is properly brought in the state courts, the law of the state, in the absence of contrary provisions in the federal statute, is controlling in all matters of practice and procedure. The process of determining on appeal whether error was committed by the trial court during the trial of the cause, and if so, whether such error is prejudicial and therefore constitutes a ground for reversal, is a matter of

practice and procedure. The terms "practice" and "procedure" together and in a larger sense, as they are used in the law, include the mode of procedure by which a legal right is enforced, as distinguished from the substantive law which gives or declares the right. (*King* v. *Schumacher*, 32 Cal.App.2d 172, 181 [89 P.2d 466]; *Woodward* v. *Southern Pac. Co.*, 35 Cal.App.2d 130, 137-138 [94 P.2d 1028]; cf. 79 A.L.R.2d 583.)

The question with respect to the propriety of advising the jury that plaintiff in an action brought under the Federal Employers' Liability Act is not protected by the Workmen's Compensation Act, that he receives no benefits under the state law, and that his sole remedy for damages, where his injury is sustained in the course of his employment in interstate transportation by rail, lies in an action brought in a court of law as distinguished from a claim made against his employer and adjudicated before the Industrial Accident Commission, appears to be one of first impression in this state.

We believe it is a matter of common knowledge that in our present day society, many women are employed in industry. If not so employed, they have members of their immediate families who are so employed. It is reasonable to assume, in these circumstances, that the men and women who sit on our juries are aware of the Workmen's Compensation Act, and are aware generally that it affords protection to employees who suffer personal injury arising out of, and which is connected with their employment, and that claims for damages for such injury, as against the employer, are heard before the Industrial Accident Commission, and not in a court of law of general jurisdiction. In these circumstances, the jurors being so informed, it would seem only normal for them to ask why, in a case such as the one before us, the employee is suing his employer in a court of general jurisdiction, rather than pursuing his remedy before the Industrial Accident Commission. While strictly speaking, the question as to why the employee who is injured in the course of his employment while engaged in interstate transportation by rail is compelled to seek his remedy in a court of law is not an issue in the action which is submitted to the jury, we cannot see why a proper explanation of the reason to the jury, either by counsel or the court, or by both, kept within reasonable limits, should prejudice either side, and result in a verdict based upon passion or prejudice.

Here, the instruction complained of, requested by plaintiff, and given by the court at the conclusion of the evidence and argument of counsel, told the jury "Since the plaintiff, George C. Bohme, was an employee of the Southern Pacific Company and engaged in interstate commerce, he was not subject to, nor covered by the rights, liabilities or rules of the Workm[e]n's Compensation Acts of the State of California, nor entitled to any benefits thereunder. The rights and duties of George C. Bohme and of the

Southern Pacific Company in this case are to be governed solely by the Federal laws which will be explained to you." This instruction was followed by comprehensive and detailed instructions bearing upon the rights, duties and obligations of both plaintiff and defendant under the Federal Employers' Liability Act. In this state of the record we do not see how the jury could have been mislead in its application of the law to the facts of the case, and we find no prejudice in either the statements of counsel, or the foregoing instruction of the court in explanation to the jury of the law applicable to the case.

### Damages

 In urging that the damages awarded plaintiff are excessive and indicate that the jury acted through passion and prejudice, defendant characterizes plaintiff's injury as a "broken left leg of a man who was 67 years old at the time of the accident and was eligible to retire." This is a gross understatement of the nature and extent of plaintiff's injuries as shown by the evidence, coupled with the prognosis that plaintiff would probably suffer continuous pain and discomfort at the site of the injury, as well as permanent disability.

 In a Federal Employers' Liability Act case, apportionment of damages under the comparative negligence rule is for the jury, subject to review if excessive as a matter of law (*Atlantic Coast Line R.R. Co.* v. *Anderson,* 267 F.2d 329, 333; *Buchanan* v. *Chicago & N.W. Ry. Co.,* 159 F.2d 576, 577-578), or is grossly excessive. (*Wetherbee* v. *Elgin, Joilet & Eastern Ry. Co.,* 191 F.2d 302, 309-310.) We find nothing in the record which would support the conclusion that the jury's apportionment of damages based upon a finding of 10 percent negligence on the part of plaintiff is erroneous as a matter of law, or is grossly excessive. "While the law furnishes no accurate means of measuring damages in personal injury cases, the rule is well established respecting the power and duty of an appellate court in considering that subject and has been stated as follows: 'The amount of damages in such cases is committed first to the sound discretion of the jury, and next to the discretion of the judge of the trial court, who, in ruling upon the motion for a new trial, may consider the evidence anew, determine anew the facts, and set aside the verdict if it is not just. Upon appeal, the decision of the trial court and jury on the subject cannot be set aside unless the verdict is "so plainly and outrageously excessive as to suggest, at first blush, passion or prejudice or corruption on the part of the jury." [Citation omitted.]' . . ." (*Mudrick* v. *Market Street Ry. Co.,* 11 Cal.2d 724, 735 [81 P.2d 950, 118 A.L.R. 533]; *Gallentine* v. *Richardson,* 248 Cal.App.2d 152, 155 [56 Cal.Rptr. 237].) Here, plaintiff suffered a severe and painful injury. He will, according to the medical testimony, be crippled as a result

of the injury for the remainder of his life. He will continue to experience pain and discomfort at the site of the injury. He had a life expectancy at the time of trial of 11.2 years. He had undergone three operations from the time of his injury until the time of trial with the possibility of a fourth operation, if necessary, to fuse the ankle joint. Under these circumstances we cannot say as a matter of law that the verdict is so plainly and outrageously excessive as to suggest passion or prejudice on the part of the jury.

The judgment is affirmed.

Stephens, Acting P. J., and Aiso, J., concurred.