[Civ. No. 6701. Fourth Dist. Dec. 15, 1961.]

FORREST M. HELTON, Plaintiff and Respondent, v. EDGAR P. STEWART, Defendant and Appellant.

French & Fleming for Defendant and Appellant.

Stephen J. Grogan and Maurice R. Hogan, Jr., for Plaintiff and Respondent.

GRIFFIN, P. J.—On May 27, 1956, at 9 :00 p. m., plaintiff and respondent Forrest M. Helton was driving a 1945 Kenworth tractor and semitrailer easterly on the road from Westmoreland to Calipatria in Imperial County. Defendant Wilford Slaughter was driving an International military surplus truck in a westerly direction thereon. Slaughter's truck swerved across the highway and struck plaintiff's truck in the westbound lane, causing considerable damage to plaintiff's truck. On inquiry from Helton, Slaughter indicated that he must have gone to sleep. The question of negligence and the amount of damages is not in dispute. The trial judge, sitting without a jury, found that at the time of the accident Stewart was the registered owner of the International truck and it was being operated and controlled by Slaughter and that Slaughter was operating it with the permission of defendant and appellant Edgar P. Stewart. The court rendered judgment against Slaughter and Stewart, the alleged owner of the International truck driven by Slaughter, for $4,689.77. Defendant Stewart appealed and argues that he was not liable under Vehicle Code, section 178 (now § 5602). The principal issue involves the ownership of the truck at the time of the accident and whether defendant Stewart complied with Vehicle Code, section 178 (now § 5602) so as to relieve him-

self of any liability under Vehicle Code, section 402 (now § 17150). The evidence in this respect, as related by defendant Stewart, is that defendant Slaughter had worked for him during hay season in removing hay from fields controlled by Stewart, for a period of a year or two; that Stewart owned two or three trucks and Slaughter drove one of them (the International) and was receiving three cents per bale for loading and delivering the hay; that in March 1956 he made an oral agreement with Slaughter whereby Slaughter would purchase the truck for $1,000 and each week thereafter Stewart would hold back his pay, except that drawn by Slaughter for living purposes, and when the truck was fully paid for he would turn over the ownership certificate to him. He stated he kept no particular account of the balance applied each week, but would count in the bale count each Saturday and would apply the net proceeds toward the principal after deducting truck expenses, withdrawals, etc., from the sum due Slaughter. He testified that he did not know how much Slaughter earned each week but guessed he drew about $30 or $40 per week. He produced no books of account at the trial, but only cancelled checks and stubs for his entire operation. He did not select from them any particular payments made for Slaughter and could not account for the amounts claimed to have been retained by him to apply on the payments for the truck. He testified that on May 27, 1956, Slaughter, while driving this truck, had an accident on the highway and wrecked the truck, but that on May 25 he was going over his books and discovered that Slaughter had made full payment for the truck and that he then endorsed the pink slip, dated it May 25, 1956, and sent it to Slaughter out in the field by Slaughter's brother and that he later, the next day, went out and verified the fact that Slaughter had received it. Slaughter denied that Stewart came out the next day and asked if he had received the pink slip. However, Slaughter later changed his story and said he did. The white certificate of registration was left in the truck, which, after the wreck, was towed to Slaughter's home. Stewart conceded that he never delivered a notice to or notified the Motor Vehicle Department under Vehicle Code, section 177, subdivision (a) (now § 5900), as required by Vehicle Code, section 178, subdivision (2), until after the filing of this action, which was about one year later. Stewart relies upon subdivision (1) of section 178, contending that he exempted himself of liability because he did make proper endorsement and delivery of the certificate of owner-

ship and delivered the certificate of registration the day before the accident.

Slaughter testified that he worked for Stewart, as indicated, and entered into some oral agreement to buy the truck for $1,000; that he drew enough money each week he worked to live on and left the balance to apply on the truck payments; that he worked seven days a week on occasions and only three or four on others; that he never kept any account of the payments made but when he received the pink slip from Stewart on May 25 he realized that he must have paid the entire balance due. Slaughter said that he never saw the white slip on the truck but he later testified that after the accident he took the white certificate from it. He testified that he earned $100 to $125 per week, but sometimes only $50. He also said that he had not filed an income tax return for many years.

There is no argument about Slaughter's negligence in the operation of his truck on the occasion mentioned, or that the truck with which he collided was damaged in the sum found due.

It appears that the pink slip and the white certificate of registration had a varied experience after the accident. Slaughter claims he had both in his possession at his house; that he sold the wrecked truck some time after the accident to one Felix Fairley for $125 because Fairley wanted the tires, and that he gave Fairley the pink and white slips unendorsed by him.

About October 10, 1956, Fairley sold the remains of the truck to one James Tucker, of the Tucker Wrecking Company, and Fairley delivered the pink slip and the white certificate of registration to Tucker without any endorsement thereon and gave Tucker a bill of sale for it. At this time, the only name on the certificate of ownership was Edgar P. Stewart and the sale date indicated was May 25, 1956. It then indicated that the name of the purchaser was "Tucker Wrecking." It contained Tucker's dealer's number, address and the date October 30, 1956. This certificate was later forwarded to the Motor Vehicle Department in Sacramento together with a document entitled "Report of Vehicle to be Dismantled or Wrecked." It was signed "Tucker's Wrecking, by J. Tucker." Neither Slaughter nor Fairley ever signed the pink slip and so far as the record of the Motor Vehicle Department was concerned it indicated a sale by Stewart on May 25, the day before the accident, to Tucker. This action

was filed against Slaughter, Stewart, Tucker Wrecking Company and Fairley on March 17, 1959.

On March 6, 1957, plaintiff's attorney wrote Tucker Wrecking Company that a truck owned by it, and purchased from Stewart on May 25, 1956, was involved in an accident and inquired as to its responsibility. In reply, Tucker wrote:

"I purchased *Sept. 25, 1956* from Felix Fairley. At time it was in name of E. P. Stewart." (Italics ours.)

After service of summons, on April 5, 1959, Slaughter wrote plaintiff's attorney:

"Herein receive correction on implication of parties mentioned as involved in the events and happenings referred to in summons MA42633.

"Wilford Slaughter, defendant, having arranged to effect purchase and transfer of 1946 International flat bed truck (referred to in summons) from Tucker's company to himself (defendant), (P. Stewart was actual owner of truck) and having closed the deal prior to events and happenings mentioned in summons hereby divorces from any responsibility of ownership of said vehicle any of all other parties defined in summons as defendant and additionally, since he (W. Slaughter) was not in the employ of the other parties at time of the accident.

"In regards to the stipulated judgment (sum of which is suggested in suit) be it known that defendant is not in any financial position to give any consideration to a settling of the judgment as mentioned."

The complaint alleged that all defendants were the owners of this truck on May 27, 1956, and that Slaughter negligently operated it. Stewart denied these allegations and, as an affirmative defense, stated that he, on May 25, 1956, signed and dated the certificate of ownership to the truck and delivered it to Slaughter on May 25, 1956 and that he filled out and signed and sent to the Department of Motor Vehicles a notice of transfer of ownership and interest in motor vehicle, as required by law, and that on May 25, all his interest and possession of the vehicle was transferred to Slaughter.

Counsel for defendant requested special findings accordingly. The trial court denied the request and found generally in favor of Tucker Wrecking Company and Fairley, but as to Stewart it found generally that the allegations of his answer were not true and specifically found his affirmative defense to be untrue. It found that the cause of the accident was the negligence of Slaughter; that at the time Stewart was the

registered owner of the truck and that it was then being operated by Slaughter, with the permission of defendant Stewart. Judgment against Stewart and Slaughter was rendered accordingly and Stewart appealed.

It should be first noted that before an owner is released from liability under either subdivision of Vehicle Code, section 178, it must be established that there was a bona fide sale or transfer of the vehicle and possession thereof. A bona fide sale means an actual sale in good faith, for value, and not a fraudulent sale. (*Silver* v. *Bank of America*, 47 Cal. App.2d 639, 644 [111 P.2d 666]; *Davis* v. *Schweikert*, 130 Cal. 143 [62 P. 411].)

The statutes involving registration of vehicles, somewhat like the statutes concerning the recording of real property transfers, are designed, among other reasons, for the protection of purchasers and injured parties, principally by affording identification of the vehicle and the person in order to prevent fraudulent practices (particularly the antedating of transfers). Dealers are required to mail a notice of the transfer to the department within a specified time as required of other transferors (although the time limitation differs). See Vehicle Code, section 177, subdivision (a) and section 178.

Strict compliance with Vehicle Code, section 178, and its allied sections relating to transfer of title or interest is required before the transferring owner may escape the liability imposed. (*Stoddart* v. *Peirce*, 53 Cal.2d 105 [346 P.2d 774].)

It is true that the complaint does not allege that the purported sale was not a bona fide sale and the findings do not directly so find. The complaint alleges that Stewart was the owner of said truck on the day of the accident and Slaughter was driving it with his consent, and the court so found. The implication from this finding is that there was no valid or bona fide sale of the truck to Slaughter at the time. In Stewart's answer, he particularly alleges as a defense that he did, in effect, sell the truck to Slaughter on May 25, 1956, two days before the accident, and that he did sign, date and deliver the pink slip (certificate of ownership) on that date, and that all of his interest and possession of said vehicle were transferred and passed to Slaughter. In support of his contentions, he cites such authority as *Venne* v. *Standard Accident Ins. Co.*, 171 Cal.App.2d 242 [340 P.2d 30]; *Piacun* v. *Hexem*, 18 Cal. App.2d 145 [63 P.2d 315]; *Woods* v. *Eastridge*, 99 Cal.App.2d 625 [222 P.2d 296]; *Weinberg* v. *Whitebone*, 87 Cal.App.2d 319, 326 [196 P.2d 963].

It should be here noted that in this connection Stewart offered a special finding that on May 25 he properly endorsed and delivered the certificate of ownership and certificate of registration to Slaughter. The court refused this offer. Stewart claims that the findings signed do not find on all material issues, citing such authority as *Estate of McAfee,* 182 Cal. App.2d 553 [6 Cal.Rptr. 79].

In support of the judgment, we are convinced that the finding is sufficient to cover the issue presented as to whether or not this was a bona fide sale or transfer.

■ It is problematical whether there was an actual delivery of the white slip (certificate of registration) by Stewart to Slaughter prior to the accident. All indications are that it was placed in a holder on the steering post of the truck by Stewart. However, Slaughter said that he did not see it there and did not receive it from Stewart. But he later said that the day following the accident he took it from the steering wheel.

Although Stewart testified that there was some oral agreement about the purchase of the truck on a time-payment plan; that Slaughter had fully paid for it on May 25; and that he had endorsed, dated and delivered the pink slip to Slaughter on that day; the trial court was not bound to accept this testimony as true in light of all the surrounding circumstances. The claimed agreement of purchase was quite indefinite as to its terms and conditions. No accounts were kept which were made available to the court for its examination as to any amounts withheld by Stewart to apply thereon. Apparently Slaughter had no knowledge of the amount claimed to have been withheld by Stewart and he registered surprise to learn that he had suddenly become the owner of the truck. Stewart admittedly did not notify the Motor Vehicle Department of the purported sale until some time after the accident. There was testimony by Stewart that he gave the pink slip to Slaughter's brother to be delivered to Slaughter in the field on May 25. Stewart did not produce this witness to testify to that fact, but claimed he was unable to find him. Slaughter never endorsed the pink slip. It might well have appeared to the trial court, from the evidence and circumstances related, that even if there was some oral agreement of purchase, the full amount of $1,000 had not been paid thereon in a period of two or three months, and that after the accident Stewart signed the pink slip and predated it to avoid personal liability as owner. See *Rainey* v. *Ross,* 106 Cal.App.2d 286 [235 P.2d

45], involving failure to deliver registration certificate, and also *Burgess* v. *Cahill,* 26 Cal.2d 320 [158 P.2d 393, 159 A.L.R. 1304]; *Casey* v. *Fortune,* 78 Cal.App.2d 922 [179 P.2d 99].

Issues of fact are for the trial court to determine and on appeal all reasonable inferences must be drawn in favor of the judgment. (*Weeks* v. *Taddeucci,* 132 Cal.App.2d 491 [282 P.2d 581]; *Juchert* v. *California Water Service Co.,* 16 Cal.2d 500 [106 P.2d 886].)

It is true that there was some confusion as to whether the trial court considered defendant's objections to the findings and request for special findings offered by him. It does appear from the date on the findings that they were signed on April 18, 1960. A copy of the proposed findings was served on counsel for defendant on March 14, 1960. A request for special findings and objections to the findings were filed on March 21, 1960. On April 13, 1960, it was stipulated between the parties that the hearing for settlement of findings be heard on April 27, 1960. Apparently, argument was had thereon. On May 19, 1960, a minute entry shows objections and proposed counterfindings having heretofore been submitted for decision were denied. An order to this effect was signed by the trial judge and dated May 18, 1960. It might well appear that the trial judge may have inadvertently signed the findings on April 18, 1960, and did not thereafter modify or change the date. Under any circumstances, it appears that the court did hear and fully consider the objections and special findings submitted and denied the request for a change. Had the trial court's attention been called to it, it had the power to correct any inadvertence and amend its findings. (*Johndrow* v. *Thomas,* 31 Cal.2d 202 [187 P.2d 681].)

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.